**Slip Op. 03-08**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                       :
NTN BEARING CORPORATION OF AMERICA,    :
AMERICAN NTN BEARING MANUFACTURING     :
CORPORATION, NTN BOWER, INC. and       :
NTN CORPORATION,                       :
                                       :
              Plaintiffs,              :
                                       :
         v.                            :    Court No.
                                       :    98-12-03232
UNITED STATES,                         :
                                       :
              Defendant,               :
                                       :
         and                           :
                                       :
THE TIMKEN COMPANY,                    :
                                       :
              Defendant-Intervenor.    :
_____:


        Plaintiffs, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Bower, Inc. and NTN Corporation (collectively "NTN"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan</u> ("<u>Final Results</u>"), 63 Fed. Reg. 63,860 (Nov. 17, 1998).

        Specifically, NTN contends that Commerce erred in: (1) adjusting NTN's reported home market billing adjustment; (2) denying an adjustment to United States indirect selling expenses for interest allegedly incurred in financing cash deposits for antidumping duties; (3) calculating constructed export price profit without regard to levels of trade; (4) including profits from export price sales in the calculation of constructed export price profit; (5) using the affiliated supplier's cost of production for

inputs in those cases when the cost was higher than the transfer price in Commerce's calculation of cost of production and constructed value; (6) recalculating home market and United States indirect selling expenses without regard to level of trade; (7) denying a price-based level of trade adjustment for constructed export price sales; (8) applying a 99.5% test to determine whether sales to NTN's affiliated parties were made at arm's length; (9) including sample transactions that were allegedly made for no consideration; (10) including certain NTN sales allegedly outside the ordinary course of trade in Commerce's margin calculations and in Commerce's constructed value profit calculations; (11) relying upon the sum-of-deviations methodology for Commerce's model match analysis; (12) using its level of trade sales match program; and (13) using an incorrect level of trade adjustment factor for certain export price sales.

**Held**: NTN's 56.2 motion is granted in part and denied in part. This case is remanded to Commerce to correct the clerical error resulting from Commerce's use of an incorrect level of trade adjustment factor for NTN's export price sales and to recalculate NTN's margin rates accordingly.

[NTN's 56.2 motion is granted in part and denied in part. Case remanded.]

Dated:    January 24, 2003

Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano, David G. Forgue and Kristen S. Smith) for NTN, plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michele D. Lynch, Kenneth J. Guido and Richard P. Schroeder); of counsel: John F. Koeppen, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

Stewart and Stewart (Terence P. Stewart, William A. Fennell and Patrick J. McDonough) for Timken, defendant-intervenor.

## OPINION

**TSOUCALAS**, **Senior Judge:** Plaintiffs, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Bower, Inc. and NTN Corporation (collectively "NTN"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan ("Final Results"), 63 Fed. Reg. 63,860 (Nov. 17, 1998).

Specifically, NTN contends that Commerce erred in: (1) adjusting NTN's reported home market billing adjustment; (2) denying an adjustment to United States indirect selling expenses for interest allegedly incurred in financing cash deposits for antidumping duties; (3) calculating constructed export price profit without regard to levels of trade; (4) including profits from export price sales in the calculation of constructed export price profit; (5) using the affiliated supplier's cost of production for inputs in those cases when the cost was higher than the transfer price in Commerce's calculation of cost of production and constructed value; (6) recalculating home market and United States

indirect selling expenses without regard to level of trade; (7) denying a price-based level of trade adjustment for constructed export price sales; (8) applying a 99.5% test to determine whether sales to NTN's affiliated parties were made at arm's length; (9) including sample transactions that were allegedly made for no consideration; (10) including certain NTN sales allegedly outside the ordinary course of trade in Commerce's margin calculations and in Commerce's constructed value profit calculations; (11) relying upon the sum-of-deviations methodology for Commerce's model match analysis; (12) using its level of trade sales match program; and (13) using an incorrect level of trade adjustment factor for certain export price sales.

## BACKGROUND

The administrative determination at issue concerns the antidumping duty order on tapered roller bearings ("TRBs") and parts thereof, finished and unfinished, from Japan (A-588-604), for the period of review ("POR") covering October 1, 1996, through September 30, 1997.[1] See Final Results, 63 Fed. Reg. at 63,860-61. On July 10, 1998, Commerce published the preliminary results. See

---

[1] Since the administrative review at issue was initiated after January 1, 1995, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

Preliminary Results of Antidumping Duty Administrative Reviews of
Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,
From Japan, and Tapered Roller Bearings, Four Inches or Less in
Outside Diameter, and Components Thereof, From Japan ("Preliminary
Results"), 63 Fed. Reg. 37,344.  Commerce published the Final
Results on November 17, 1998.  See 63 Fed. Reg. 63,860.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19
U.S.C. § 1516a(a) (2000) and 28 U.S.C. § 1581(c) (2000).

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in
an antidumping administrative review, the Court will uphold
Commerce's determination unless it is "unsupported by substantial
evidence on the record, or otherwise not in accordance with law .
. . ."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

### I.   Substantial Evidence Test

Substantial evidence is "more than a mere scintilla.  It means
such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion."  Universal Camera Corp. v. NLRB,
340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB,
305 U.S. 197, 229 (1938)).  Substantial evidence "is something less

than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).  Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"  American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).

## II.  Chevron Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." Id. at 842.  "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'"  Timex V.I., Inc. v. United

States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning. Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter." Id. (citations omitted). Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations omitted); but see Floral Trade Council v. United States, 23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. See Chevron, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if

the court might have preferred another"); see also IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United States, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. See Mitsubishi Heavy Indus. v. United States, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

**DISCUSSION**

**I.   Commerce's Adjustment to NTN's Reported Home Market Billing Adjustment**

   **A.   Background**

During the POR, NTN provided Commerce with "its [home market] sales data via computer tape." Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s Mem.") at 9-10. Commerce used the home market sales data from the computer tape and calculated both a positive and negative home market billing adjustment for NTN. See id. at 10 (citing App. NTN's Mot. and Mem. Supp. J. Agency R. ("NTN's App. Mem.") Attach. 3 at 2-3 n.1) (proprietary version). NTN also provided Commerce

with "its [home market] sales volume and value reconciliation worksheet" which contained a total positive home market billing adjustment. Def.'s Mem. at 10 (citing App. Def.'s Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s App. Mem.") Ex. 1 (proprietary version); NTN's App. Mem. Attach. 2 at A2-a (proprietary version)). In the Final Results, Commerce stated:

> [Commerce] agrees with [Timken]. In [Final Results of Antidumping Duty Administrative Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan] ("95/96 TRB Final"), [63 Fed. Reg. 2558, 2563 (Jan. 15, 1998)], Timken argued that because there were certain inconsistencies between NTN's computer tape home market billing adjustment total and the billing adjustment figure reported in NTN's volume and value worksheet, [Commerce] should modify accordingly the reported adjustments to be consistent with those appearing on the volume and value reconciliation worksheets . . . . For the current review, as Timken has indicated, these same inconsistencies exist between NTN's reported data and its volume and value reconciliation worksheets (provided [in NTN's App. Mem. Attach. 2 at] A2-a through A2-c [(proprietary version)]. . .). NTN attempts to explain such inconsistencies in its supplemental response at [Def.'s App. Mem. Ex. 1 at] 4 [(proprietary version)] and at [NTN's App. Mem. Attach. 2 at] A2-c [(proprietary version)], using a hypothetical example which purportedly demonstrates why it claims the totals reported on the sales tape and the totals reported on the volume and value worksheet are not necessarily equal. However, NTN's attempt to reconcile these totals does not sufficiently explain the significant discrepancies between them. Therefore, for these final results, [Commerce] ha[s] adjusted NTN's reported home market billing adjustment total to be consistent with that on its volume and value worksheet. . . .

Final Results, 63 Fed. Reg. at 63,861.

Commerce explained its methodology stating that

> [because the] billing adjustment reconciliation chart
> provided by NTN did not clearly demonstrate why there was
> such a significant difference between the billing
> adjustment totals [that is, between NTN's volume and
> value worksheet and the total billing adjustment derived
> from NTN's home market database] . . . [Commerce]
> adjusted NTN's reported transaction-specific billing
> adjustments to reflect the total from its volume and
> value worksheet.
>
> . . . . In order to calculate a billing adjustment
> amount representative of the volume and value worksheet
> [amount], [Commerce] systematically sorted through NTN's
> home market database until [Commerce] arrived at a
> [certain value], that, when added to the existing
> positive billing adjustment value . . . equaled the total
> reported billing adjustment from the worksheet. The
> remaining negative billing adjustments were then set
> equal to zero.

NTN's App. Mem. Attach. 3 at 3.

### B.   Contentions of the Parties

NTN argues that Commerce erred when it used facts available to

"adjust NTN's total billing adjustment in the home market."  NTN's

Mot. and Mem. Supp. J. Agency R. ("NTN's Mem.") at 12; see NTN's

Reply Def. and Def.-Int.'s Mem. Opposing Pls.' Mot. J. Agency R.

("NTN's Reply") at 2-3.  In particular, NTN maintains that there is

no basis under 19 U.S.C. § 1677e (1994) for Commerce to use facts

available.  See NTN's Mem. at 13; see also NTN's Mem. at 13-14

(relying on Olympic Adhesives v. United States, 899 F.2d 1565 (Fed.

Cir. 1990)).  Therefore, NTN requests that this Court remand to

Commerce to use NTN's originally submitted data for the total

billing adjustment in the home market.  See NTN's Mem. at 14; NTN's Reply at 2-3.

In the alternative, NTN argues that even if Commerce was correct in adjusting NTN's reported home market billing adjustments, Commerce's "methodology is flawed in that it only accounts for billing and quantity adjustments during the period of review" (that is, Commerce ignored billing adjustments made before and after the period of review).  NTN's Mem. at 14-15.

Commerce responds that its treatment of NTN's home market billing adjustments is supported by substantial evidence and is in accordance with law.  See Def.'s Mem. at 9-16.  Commerce maintains that "'[n]either the pre-URAA nor the amended law imposes standards establishing the circumstances under which Commerce is to grant or deny [billing] adjustments to normal value [("NV")].'"  Def.'s Mem. at 14 (quoting Timken Co. v. United States, 22 CIT 621, 628, 16 F. Supp. 2d 1102, 1108 (1998)).  Moreover, Commerce argues that "[t]his Court has previously upheld disparate treatment by Commerce of upward and downward [home market] billing adjustments."  Def.'s Mem. at 13; see also Def.'s Mem. at 13-14 (relying on SKF USA Inc. v. United States, 23 CIT 402 (1999)).[2]

_____

[2]  In its reply brief, NTN argues that Commerce's reliance on SKF USA Inc., 23 CIT 402, is inapposite because in the case at bar, "NTN fully responded to [Commerce's] requests in the requested
(continued...)

Additionally, responding to NTN's argument that Commerce erroneously ignored billing adjustments made before and after the period of review, Commerce asserts that "Commerce considered all the billing adjustment information submitted by NTN[] . . . [and] chose to accept the positive billing adjustment total from NTN's volume and value worksheet because NTN failed to meet its burden to reconcile that billing adjustment total with the different totals drawn from NTN's computer tape sales data." Def.'s Mem. at 15 (citing Final Results, 63 Fed. Reg. at 63,861). Commerce further maintains that it requested that NTN clarify its claimed billing adjustments, and NTN failed to do so. See Def.'s Mem. at 16 (citing Def.'s App. Mem. Ex. 1 at 4 (proprietary version)).

Timken agrees with Commerce and contends that NTN's argument that Commerce erroneously used "facts available" to adjust NTN's home market billing adjustment is misplaced because "Commerce's adjustment to NTN's billing adjustments was simply an action to reconcile conflicting data which NTN had submitted on the same issue." Resp. Timken Pls.' Mot. J. Agency R. ("Timken's Resp.") at 8; see also Timken's Resp. at 7-12.

---

[2](...continued) format[,]" whereas in SKF USA Inc., 23 CIT 402, Commerce "decided that a punitive decision to accept only the properly reported part of the adjustments was in order, so as to deny SKF the benefit of improper reporting." NTN's Reply at 2.

### C.   Analysis

The Court finds that NTN's argument that Commerce erroneously used "facts available" under 19 U.S.C. § 1677e when Commerce adjusted NTN's billing adjustment in the home market has no merit since NTN clearly misreads the clear language of that statute. The antidumping statute mandates that Commerce use "facts otherwise available" (commonly referred to as "facts available") if "necessary information is not available on the record" of an antidumping proceeding.  19 U.S.C. § 1677e(a)(1).  In addition, Commerce may use facts available where an interested party or any other person: (1) withholds information that has been requested by Commerce; (2) fails to provide the requested information by the requested date or in the form and manner requested, subject to 19 U.S.C. § 1677m(c)(1), (e)[3] (1994); (3) significantly impedes an

---

[3]   Section 1677m(e) states that:

[i]n reaching a determination under [19 U.S.C.] section 1671b, 1671d, 1673b, 1673d, 1675, or 1675b[,] . . . [Commerce] shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by [Commerce], if—-

    (1) the information is submitted by the deadline established for its submission,
    (2) the information can be verified,
    (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
    (4) the interested party has demonstrated that it acted to the best of its ability in providing the

(continued...)

antidumping proceeding; and (4) provides information that cannot be verified as provided in 19 U.S.C. § 1677m(i) (1994). See 19 U.S.C. § 1677e(a)(2)(A)-(D). Section 1677e(a) provides, however, that the use of facts available shall be subject to the limitations set forth in 19 U.S.C. § 1677m(d)(1994).

The legislative goal behind Commerce's right to use facts available is to "induce respondents to provide Commerce with requested information in a timely, complete, and accurate manner . . . ." National Steel Corp. v. United States, 18 CIT 1126, 1129, 870 F. Supp. 1130, 1134 (1994). Consequently, Commerce enjoys very broad, although not unlimited, discretion with regard to the propriety of its use of facts available. See generally, Olympic Adhesives, 899 F.2d 1565 (acknowledging Commerce's broad discretion with regard to the use of facts available but pointing out that Commerce's resort to facts available is an abuse of discretion where the information Commerce requests does not and could not exist).

---

[3](...continued)
information and meeting the requirements established by [Commerce] with respect to the information, and
      (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).

During the review at issue, NTN reported home market billing adjustments via its computer tape.  See Def.'s Mem. at 9-10; NTN's App. Mem. Attach. 3 at 2.   Pursuant to Commerce's supplemental questionnaire, NTN also provided Commerce with a sales volume and value reconciliation worksheet.  See Def.'s Mem. at 10; NTN's App. Mem. Attach. 3 at 2-3 (proprietary version); NTN's App. Mem. Attach. 2 at A2-a (proprietary version).  In the Final Results, Commerce stated that

> inconsistencies exist between NTN's reported data and its volume and value reconciliation worksheets (provided [in NTN's App. Mem. Attach. 2 at] A2-a through A2-c [(proprietary version)]. . .).  NTN attempts to explain such inconsistencies in its supplemental response at [Def.'s App. Mem. Ex. 1 at] . . . 4 [(proprietary version)] and at [NTN's App. Mem. Attach. 2 at] A2-c [(proprietary version)], using a hypothetical example which purportedly demonstrates why it claims the totals reported on the sales tape and the totals reported on the volume and value worksheet are not necessarily equal. However, NTN's attempt to reconcile these totals does not sufficiently explain the significant discrepancies between them.

Final Results, 63 Fed. Reg. at 63,861.  Faced with the situation where the "billing adjustment reconciliation chart provided by NTN did not clearly demonstrate why there was such a significant difference between the billing adjustment totals" that is, between NTN's volume and value worksheet and the total billing adjustment derived from NTN's home market database, "[Commerce] adjusted NTN's reported transaction-specific billing adjustments to reflect the

total from its volume and value worksheet.[4]"  NTN's App. Mem.
Attach. 3 at 3.  Since Commerce did not resort to any data other
than that reported by NTN, Commerce's adjustment to NTN's reported
billing adjustment did not constitute the "erroneous" use of "facts
available" under 19 U.S.C. § 1677e.

The Court also finds that Commerce's methodology of adjusting
NTN's reported home market billing adjustments is reasonable, is
supported by substantial evidence and is in accordance with law.
See  NTN Bearing Corp. of Am. v. United States ("NTN 2002"), 26 CIT
___, ___, 186 F. Supp. 2d 1257, 1295-97 (2002); 95/96 TRB Final, 63
Fed. Reg. at 2563; see also Timken Co., 22 CIT at 628, 16 F. Supp.
2d at 1108 ("Neither the pre-URAA nor the . . . amended [law]
imposes standards establishing the circumstances under which
Commerce is to grant or deny adjustments to NV for [post-sale price
adjustments, that is, billing adjustments]").  Moreover, the Court

---

[4]   Commerce explained its methodology of adjusting NTN's
reported transaction-specific billing adjustments to reflect the
total from NTN's volume and value worksheet as follows:

> . . . .  In order to calculate a billing adjustment
> amount representative of the volume and value worksheet
> [amount], [Commerce] systematically sorted through NTN's
> home market database until [Commerce] arrived at a
> [certain value], that, when added to the existing
> positive billing adjustment value . . . equaled the total
> reported billing adjustment from the worksheet.  The
> remaining negative billing adjustments were then set
> equal to zero.

NTN's App. Mem. Attach. 3 at 3.

is not persuaded by NTN's argument that Commerce's methodology is flawed because NTN fails to point to any record evidence demonstrating error in Commerce's adjustment methodology.

Accordingly, the Court sustains Commerce's adjustment to NTN's reported home market billing adjustments.

## II. Denial of an Adjustment to United States Indirect Selling Expenses for Interest Allegedly Incurred in Financing Cash Deposits for Antidumping Duties

### A.   Background

During the review at issue, NTN requested Commerce to make an adjustment to NTN's United States indirect selling expenses for interest allegedly incurred by NTN in financing cash deposits for antidumping duties.  See Final Results, 63 Fed. Reg. at 63,865. "Commerce denied the adjustment and deducted the entire amount of [NTN's] indirect selling expenses, including all interest, from the [constructed export price] ("CEP")."  Def.'s Mem. at 17.  Commerce explained:

> Antidumping duties, cash deposits of antidumping duties, and other expenses such as legal fees associated with participation in an antidumping case are not expenses that [Commerce] should deduct from [United States] price. To do so would involve a circular logic that could result in an unending spiral of deductions for an amount that is intended to represent the actual offset for the dumping . . . .  Underlying [Commerce's] logic in all of these instances is an attempt to distinguish between business expenses that arise from economic activities in the United States and business expenses that are direct, inevitable consequences of an antidumping duty order.

Financial expenses allegedly associated with cash deposits are not a direct, inevitable consequence of an antidumping duty order. As [Commerce] stated previously . . . : money is fungible. If an importer acquires a loan to cover one operating cost, that may simply mean that it will not be necessary to borrow money to cover a different operating cost. . . . There is nothing inevitable about a company having to finance cash deposits and there is no way for [Commerce] to trace the motivation or use of such funds even if it were.

Even if [NTN] has a loan amount that equals its cash deposits or can demonstrate a "paper trail" connecting the loan amount to cash deposits, [Commerce] do[es] not consider the loan amount to be related to the cash deposits and will not remove it from the [indirect selling expenses]. Moreover, the result should not be different where an actual expense can not be associated in any way with the cash deposits. [Commerce] reject[s] imputation of an adjustment because there is no real opportunity cost associated with cash deposits when the paying of such deposits is a precondition for doing business in the United States. As a result, [Commerce] ha[s] not accepted NTN's reduction in [indirect selling expenses] based on actual borrowings to finance cash deposits nor will [Commerce] accept such a reduction based on imputed borrowings. [Commerce] consider[s] all financial expenses the affiliated importer incurred with respect to sales of subject merchandise in the United States to be [indirect selling expenses]. . . .

. . . . Although in past reviews [Commerce] ha[s] removed expenses for financing cash deposits, [Commerce] ha[s] reexamined this issue and [Commerce's] current policy is to deny the adjustment. [Commerce] has concluded that [Commerce's] new policy is reasonable and best reflects commercial reality with respect to affiliated-importer situations. . . .

Final Results, 63 Fed. Reg. at 63,865-66 (internal quotation and

citations omitted).

**B.    Contentions of the Parties**

NTN asserts that Commerce wrongly denied an adjustment to NTN's United States indirect selling expenses for interest that NTN allegedly incurred in financing cash deposits for antidumping duties.  See NTN's Mem. at 4, 15-18.  NTN claims that Commerce's rationale for denying NTN's adjustment for interest expenses is flawed because irrespective of how a company opts to finance the cash deposits for antidumping duties, the amount of cash deposited will have to be made up by financing something else, a result that is a direct inevitable consequence of the antidumping duty order. See id. at 16.

Further, NTN notes that Commerce has previously taken the position that interest expenses incurred in financing cash deposits of antidumping duties cannot be properly treated as indirect selling expenses and, therefore, has allowed for an interest-expense adjustment on antidumping duty cash deposits.  See id. (citing Final Results of Antidumping Duty Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom ("Previous Ruling"), 62 Fed Reg. 2087,[5] 2104 (Jan. 15, 1997)).

---

[5]  The Court presumes that NTN, while citing to 62 Fed. Reg. 2087, intended to cite to 62 Fed. Reg. 2081.

NTN also asserts that this Court has repeatedly held that the costs incurred solely in financing antidumping duty cash deposits cannot be categorized as selling expenses. See NTN's Mem. at 16-17. In particular, NTN argues that Federal-Mogul Corp. v. United States, 20 CIT 1438, 1440-41, 950 F. Supp. 1179, 1182-83 (1996), clearly refutes Commerce's decision to deny NTN's interest-expense adjustment. See NTN's Mem. at 18. NTN notes that the court in Federal-Mogul found that there was no support for a domestic party's "assertion that any expense related to antidumping proceedings is automatically a selling expense related to the sale of the subject merchandise. Indeed, pursuant to the rationale of (Daewoo Elecs. Co. v. United States, 13 CIT 253, 270, 712 F. Supp. 931, 947 (1989)), such expenses are not necessarily selling expenses." Id. at 17 (quoting Federal-Mogul, 20 CIT at 1440-41, 950 F. Supp. at 1183). NTN points out that the court in Federal-Mogul found that, similar to the Daewoo court's holding that legal expenses related to antidumping proceedings are not selling expenses, the interest expenses at issue did not qualify as selling expenses because they were not related to the sale of merchandise, but to NTN's participation in the antidumping proceeding. See NTN's Mem. at 18. NTN further points out that the court in Federal-Mogul "rejected the domestic party's argument that NTN's interest adjustment is duplicative of that allowed under the statute" and found "the adjustment for expenses for interest

expenses on cash deposits is an actual expense, although not a selling expense, for which the statute does not compensate NTN." Id. NTN also notes that in <u>NSK Ltd. v. United States</u>, 21 CIT 617, 638, 969 F. Supp. 34, 55 (1997), the Court reaffirmed its decision in <u>Federal-Mogul</u> to allow NTN's adjustment for interest expenses on antidumping duty cash deposits. <u>See id</u>. NTN requests that the Court remand this issue to Commerce to grant NTN's indirect selling expense adjustment for interest NTN allegedly incurred in financing cash deposits for antidumping duties. <u>See id.</u>; NTN's Reply at 6.

Commerce maintains that Commerce's denial of an adjustment to NTN's United States indirect selling expenses for interest allegedly incurred in financing antidumping duty cash deposits reflected Commerce's reasonable reading and application of 19 U.S.C. § 1677a(d)(1) (1994). <u>See</u> Def.'s Mem. at 18-20. Commerce further maintains that it "has set forth a . . . reasonable rationale for its departure from the previous practice."[6] <u>Id.</u> at

---

[6] In its brief, NTN states:

NTN has not argued that [Commerce] may not reasonably change its methodologies. Instead, NTN argued in its memorandum in support of its motion for judgment on the agency record, and argues here, that the rationale provided at <u>Final Results</u>, 63 Fed. Reg. at 63,866 does not comport with economic reality, is not reasonable, and defies logic. In addition, [Commerce's] decision conflicts with judicial precedent, and its own well reasoned statements supporting an adjustment for this expense in the past. Therefore, NTN respectfully

(continued...)

20.

Timken supports Commerce's contentions and points out that: (1) "the purpose of the statutory provision for interest on over and under deposits of duties would be defeated by allowing an expense reduction for interest on cash deposits," Timken's Resp. at 14; and (2) "NTN failed to demonstrate that it actually incurred interest expenses due to financing antidumping duty cash deposits,"

_____

[6](...continued)
requests that this Court ignore the United States' argument regarding the legality of [Commerce] ever changing its methodology, and find this change by [Commerce] unreasonable and contrary to law for the reasons stated in [NTN's] memorandum in support of [NTN's] motion for judgment on the agency record.

NTN's Reply at 3-4 (emphasis omitted).

As a preliminary matter, the Court does not agree with NTN that Commerce's denial of an adjustment to NTN's United States indirect selling expenses for interest allegedly incurred by NTN in financing NTN's cash deposits for antidumping duties is a change in methodology. Rather, it is a change of policy. While a methodology refers to the "performing [of] several operations[] in the most convenient order," BLACK'S LAW DICTIONARY 991 (6th ed. 1990), policy "denotes . . . [the] general purpose . . . [of the statute] considered as directed to the welfare or prosperity of the state," id. at 1157; accord Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir. 1983); Interstate Natural Gas Ass'n of Am. v. Federal Energy Regulatory Comm'n, 716 F.2d 1 (D.C. Cir. 1983); Hooker Chems. & Plastics Corp. v. Train, 537 F.2d 620 (2d Cir. 1976).

Moreover, the Court does not agree with NTN that the Court should "ignore the United States' argument regarding the legality of" Commerce's change in policy. NTN's Reply at 4. The legality of Commerce's change in policy is a precondition that the Court must address in order to subsequently determine whether Commerce's decision at issue was in accordance with law and reasonable.

id. at 15.[7]


     C.    Analysis

          1.    Commerce's Changes of Policy

     Agency statements provide guidance to regulated industries.

While "'an agency does not act rationally when it chooses and

implements one policy and decides to consider the merits of a

potentially inconsistent policy in the very near future,'"

_____

     [7] The Court disagrees with Timken's contentions that these two
points could be dispositive of the issue.  Timken asserts that

     allow[ing] respondents to reduce their selling expenses
     by amounts of imputed interest allegedly incurred in
     financing antidumping duty deposits (with consequent
     increase in [United States] prices and reduction of
     margins of dumping), Commerce would provide an incentive
     to respondents to prolong litigation over entries so as
     to avoid actual payment of duties.

Timken's Resp. at 15.

     The Court is not convinced by Timken's argument.  A defeat in
litigation implies the necessity of eventual payment of the duties
due, and the mere possibility of "opportunity use," possibly
resulting in collection of interest on the funds available calls
for an argument seeking collection of duties together with a
prevailing interest rate rather than for the "anti-incentive"
argument fostered by Timken.

     Next, not only does the record contain NTN's claim for the
amount of imputed interest attributable to NTN's antidumping duty
deposits (the claim that, under the administrative scheme, is
subject to verification by Commerce rather than Timken), but also
the factual inquiry of whether NTN actually incurred interest
expenses attributable to financing payment is secondary to the
threshold legal inquiry if an adjustment should be allowed for such
expenses.

Transcom, Inc. v. United States, 24 CIT ___, ___, 123 F. Supp. 2d 1372, 1381 (2000) (quoting ITT World Communications, Inc. v. FCC, 725 F.2d 732, 754 (D.C. Cir. 1984)), Commerce, in view of the rapidly-changing world of global trade and Commerce's limited resources, should be able to rely on its "unique expertise and policy-making prerogatives." Southern Cal. Edison Co. v. United States, 226 F.3d 1349, 1357 (Fed. Cir. 2000). "'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy . . . .'" Chevron, 467 U.S. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

An agency decision involving the meaning or reach of a statute that reconciles conflicting policies "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [and a reviewing court] should not disturb [the agency decision] unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" Chevron, 467 U.S. at 845 (quoting United States v. Shimer, 367 U.S. 374, 382-83 (1961)). Furthermore, an agency must be allowed to assess the wisdom of its policy on a continuing basis. Under the Chevron regime, agency discretion to reconsider policies is inalienable. See Chevron, 467 U.S. at 843. Any assumption that Congress intended to freeze an

administrative interpretation of a statute would be entirely
contrary to the concept of <u>Chevron</u> which assumes and approves the
ability of administrative agencies to change their interpretations.
<u>See, e.g.</u>, <u>Maier, P.E. v. United States EPA</u>, 114 F.3d 1032, 1043
(10th Cir. 1997), <u>J.L. v. Social Sec. Admin.</u>, 971 F.2d 260, 265 (9th
Cir. 1992), <u>Saco Defense Sys. Div., Maremont Corp. v. Weinberger</u>,
606 F. Supp. 446, 450-51 (D. Me. 1985).  In sum, underlying agency
interpretative policies "are given controlling weight unless they
are arbitrary, capricious, or manifestly contrary to the statute."
<u>Chevron</u>, 467 U.S. at 844.

### 2.    Commerce's Determination at Bar

Certain expenses incurred by the affiliated seller during the
process of selling the subject merchandise in the United States are
subject to deduction from the CEP of the seller.  <u>See</u> 19 U.S.C. §
1677a(d)(1).  However, Section 1677a(d)(1) of Title 19 does not
provide a closed and exhaustive list of such expenses.  <u>See id.</u>
Consequently, Commerce considers certain ancillary expenses as part
of the incurred indirect expenses subject to deduction under
Section 1677a(d)(1).  For example, while antidumping duties and
cash deposits have never been considered by Commerce as expenses
deductible from United States price, <u>see Final Results of
Antidumping Duty Administrative Reviews of Antifriction Bearings
(Other Than Tapered Roller Bearings) and Parts Thereof From France,</u>

Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom ("Later Ruling"), 62 Fed. Reg. 54,043, 54,079 (Oct. 17, 1997), interest expenses incurred in connection with selling activities in the United States were deemed deductible from United States price. See Final Results, 63 Fed. Reg. at 63,865-66. Therefore, for those expenses that Commerce deemed to be non-selling expenses, Commerce allowed an adjustment to indirect selling expenses. See id.

For some period of time, Commerce's practice was to deem financing interest of cash deposits as not a selling expense and, therefore, Commerce did allow respondents that incurred financing interest of cash deposits to deduct such interest from indirect selling expenses prior to the deduction of such indirect selling expenses from the CEP. See Previous Ruling, 62 Fed. Reg. at 2104. However, at a later point, Commerce reexamined this practice and the policies underlying it. Specifically, Commerce observed that

> [t]he statute does not contain a precise definition of
> what constitutes a selling expense. Instead, Congress
> gave [Commerce] discretion in this area. It is a matter
> of policy whether [Commerce] consider[s] there to be any
> financing expenses associated with cash deposits.
> [Commerce] recognize[s] that [Commerce] ha[s], to a
> limited extent, removed such expenses from indirect
> selling expenses for such financing expenses in past
> reviews . . . . However, [Commerce] ha[s] reconsidered
> [Commerce's] position on this matter and ha[s] now
> concluded that this practice is inappropriate.

Later Ruling, 62 Fed. Reg. at 54,079.

Commerce has the discretion to alter its policy, so long as Commerce presents a reasonable rationale for its departure from the previous practice.  See Chevron, 467 U.S. at 843; Timken Co., 22 CIT at 628, 16 F. Supp. 2d at 1106.  Commerce explained its rationale for the reconsideration as follows:

> Underlying [Commerce's] logic . . . is an attempt to distinguish between business expenses that arise from economic activities in the United States and business expenses that are direct, inevitable consequences of the dumping order.
>
> Financial expenses allegedly associated with cash deposits are not a direct, inevitable consequence of an antidumping order. . . . Companies  may choose to meet obligations for cash deposits in a variety of ways that rely on existing capital resources or that require raising new resources through debt or equity. . . .  In fact, companies face these choices every day regarding all their expenses and financial obligations. There is nothing inevitable about a company having to finance cash deposits and there is no way for [Commerce] to trace the motivation or use of such funds even if it were.
>
> . . . .
>
> So, while under the statute [Commerce] may allow a limited exemption from deductions from [United States] price for cash deposits themselves and legal fees associated with participation in dumping cases, [Commerce] do[es] not see a sound basis for extending this exemption to financing expenses allegedly associated with financing cash deposits. . . .
>
> [Commerce] see[s] no merit to the argument that, since [Commerce] do[es] not deduct cash deposits from [United States] price, [Commerce] should also not deduct financing expenses that are arbitrarily associated with cash deposits.  To draw an analogy as to why this logic is flawed, [Commerce] also do[es] not deduct corporate taxes from [United States] price; however, [Commerce] would not consider a reduction in selling expenses to reflect financing alleged to be associated with payment

of such taxes.

Later Ruling, 62 Fed. Reg. at 54,079;  see also Final Results, 63 Fed. Reg. at 63,865-66 and Final Results of Antidumping Duty Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, 63 Fed. Reg. 33,320, 33,348 (June 18, 1998).

The Court finds Commerce's rationale for reconsideration convincing.  Cf. Timken Co., 22 CIT at 628, 16 F. Supp. 2d at 1106 (upholding Commerce's reconsideration and noting that, while the Court could be concerned with Commerce's sudden change in practice, Commerce is afforded significant deference in its statutory interpretation).  Moreover, the Court holds that Commerce's current interpretation of Section 1677a(d)(1) is reasonable. See Chevron, 467 U.S. at 845; Koyo Seiko Co. v. United States, 26 CIT ___, ___, 186 F. Supp. 2d 1332, 1337 (2002); NTN 2002, 26 CIT at___, 186 F. Supp. 2d at 1278; NTN Bearing Corp. of Am. v. United States ("NTN 2000"), 24 CIT ___, ___, 104 F. Supp. 2d 110, 138 (2000), aff'd, 295 F.3d 1263 (2002).  Therefore, the Court affirms Commerce's decision to deny an adjustment to NTN's United States indirect selling expenses for interest allegedly incurred by NTN in financing NTN's cash deposits for antidumping duties.

III. **Commerce's Decision to Calculate Constructed Export Price Profit Without Regard to Levels of Trade**

   A.    **Background**

      1.    **Statutory Background**

In calculating CEP, Commerce must reduce the starting price used to establish CEP by "the profit allocated to the expenses described in paragraphs (1) and (2)" of 19 U.S.C. § 1677a(d) (1994).  19 U.S.C. § 1677a(d)(3).  Under 19 U.S.C. § 1677a(f) (1994), the "profit" that is deducted from this starting price is "determined by multiplying the total actual profit by [a] percentage" calculated "by dividing the total United States expenses by the total expenses."  19 U.S.C. §§ 1677a(f)(1) and (2)(A).  Section 1677a(f)(2)(B) defines "total United States expenses" as the total expenses deducted under 19 U.S.C. § 1677a(d)(1) and (2), that is, commissions, direct and indirect selling expenses, assumptions, and the cost of any further manufacture or assembly in the United States.  Section 1677a(f)(2)(C) establishes a tripartite hierarchy of methods for calculating "total expenses."  "Total expenses" could be the "expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country" if Commerce requested such expenses for the purpose of determining NV and CEP.  Id. 19 U.S.C. § 1677a(f)(2)(C)(i).  If Commerce did not request these expenses,

then "total expenses" are the "expenses incurred with respect to
the narrowest category of merchandise sold in the United States and
the exporting country which includes the subject merchandise." 19
U.S.C. § 1677a(f)(2)(C)(ii). If the data necessary to determine
"total expenses" under either of these methods is not available,
then "total expenses" are the "expenses incurred with respect to
the narrowest category of merchandise sold in all countries which
includes the subject merchandise." 19 U.S.C. §
1677a(f)(2)(C)(iii). "Total actual profit" is based on whichever
category of merchandise is used to calculate "total expenses" under
19 U.S.C. § 1677a(f)(2)(C). See 19 U.S.C. § 1677a(f)(2)(D).

### 2. Factual Background

During this POR, NTN argued that profit levels differed by
level of trade ("LOT") and had an effect on prices and CEP profit
and, therefore, Commerce should calculate CEP profit on an LOT-
specific basis rather than for each class or kind of merchandise.
See Final Results, 63 Fed. Reg. at 63,866. NTN reasoned that 19
U.S.C. § 1677a(f)(2)(C) "expresses a preference for the [CEP]
profit calculations to be performed as specifically as possible and
on as narrow a basis as possible." Id.

Commerce rejected NTN's argument, concluding that: (1)
"[n]either the statute nor the [Statement of Administrative Action]

("SAA")[8] requires [Commerce] to calculate CEP profit on a basis more specific than the subject merchandise as a whole"; (2) basing the CEP profit calculation on an LOT specific basis would "add a layer of complexity to an already complicated exercise with no increase in accuracy"; and (3) a "subdivision [of] the CEP profit calculation would be more susceptible to manipulation."  Id. (Commerce also relied on its detailed explanation made in the sixth review of the antifriction bearings ("AFBs")).[9]

---

[8]    The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements."  H.R. Doc. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.  "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application").

[9]  In the sixth AFB review, Commerce reasoned as follows:

Neither the statute nor the SAA require[s] [Commerce] to calculate CEP profit on bases more specific than the subject merchandise as a whole.  Indeed, while [Commerce] cannot at this time rule out the possibility that the facts of a particular case may require division of CEP profit, the statute and SAA, by referring to "the" profit, "total actual profit," and "total expenses" imply that [Commerce] should prefer calculating a single profit figure.  NTN's suggested approach would also add a layer of complexity to an already complicated exercise with no guarantee that the result will provide any increase in accuracy.  [Commerce] need not undertake such a calculation (see Daewoo Electronics v. International Union, 6 F.3d 1511, 1518-19 (CAFC 1993)).  Finally,

(continued...)

B.    Contentions of the Parties

NTN contends that Commerce erred by refusing to calculate CEP profit on an LOT specific basis. See NTN's Mem. at 18. NTN argues that 19 U.S.C. § 1677a(f) expresses a preference for the CEP profit calculation to be performed as specifically as possible. See id. at 19. Moreover, NTN claims that since constructed value ("CV") profit is calculated by LOT and matching is by LOT, CEP profit should be calculated to account for differences in LOT. See id. at 20. NTN asserts that "[t]here is no reason to use a less specific, less accurate mode of calculation." Id. NTN further asserts that Commerce's speculation that an adjustment is susceptible to manipulation provides no grounds for rejecting an adjustment. See id. at 19.

Commerce responds that it properly determined CEP profit without regard to LOT. See Def.'s Mem. at 22. Commerce notes that 19 U.S.C. § 1677a(f) does not refer to LOT, that is, the statute does not require that CEP profit be calculated on an LOT specific basis. See id. at 23. Moreover, Commerce asserts that even

_____

[9](...continued)
subdivision of the CEP-profit calculation would be more susceptible to manipulation. Congress has specifically warned [Commerce] to be wary of such manipulation of the profit allocation (see S. Rep. 103-412, 103d Cong., 2d Sess at 66-67).

Previous Ruling, 62 Fed. Reg. at 2125; see also 95/96 TRB Final, 63 Fed. Reg. at 2570.

assuming that a narrower basis for the CEP profit calculation is warranted in some circumstances, NTN has not provided any factual support for such a deviation from Commerce's standard methodology for calculating CEP profit. See id. at 24. Timken generally agrees with Commerce's CEP profit calculation. See Timken's Resp. at 16-18. In addition, Timken argues that the Court lacks jurisdiction over the issue of Commerce's calculation of CEP profit without regard to LOT because Commerce did not ultimately make an adjustment to NTN's United States sales for CEP profit.[10] Timken's Resp. at 17 (proprietary version).

### C. Analysis

Section 1677a(f), as Commerce correctly notes, does not make any reference to LOT. Accordingly, the Court's duty under Chevron,

---

[10] The Court is bewildered by Timken's argument that the Court would be rendering an opinion on a moot issue had the Court decided to rule on the calculation of NTN's CEP profit without regard to LOT. See Timken's Resp. at 17 (proprietary version). Timken's reliance on Rose Bearings Ltd. v. United States, 14 CIT 801, 751 F. Supp. 1545 (1990), is misplaced since in that case, the Court held that it lacked jurisdiction after determining that the plaintiff did not have standing, that is, that the plaintiff was not a party to a "live case or controversy" since the plaintiff "was not subject to the antidumping duty order that it ha[d] appealed . . . ." Rose Bearings, 14 CIT at 802, 751 F. Supp. at 1546. Unlike the plaintiff in Rose Bearings, NTN could be affected by the challenge to Commerce's calculation of CEP profit without regard to LOT. See Final Results, 63 Fed. Reg. at 63,866. Therefore, this Court is correct in rendering a decision on the issue of Commerce's calculation of NTN's CEP profit without regard to LOT since NTN is a party to a "live case or controversy."

467 U.S. 837, is to review the reasonableness of Commerce's statutory interpretation. See IPSCO, 965 F.2d at 1061 (citing Chevron, 467 U.S. at 844).

Commerce's refusal to calculate CEP profit on an LOT specific basis is reasonable and in accordance with law. See NTN 2000, 24 CIT at ___, 104 F. Supp. 2d at 133-35. The language of the statute clearly contemplates that, in general, the "narrowest category" will include the class or kind of merchandise that is within the scope of an investigation or review. See id., 24 CIT at __, 104 F. Supp. 2d at 133-35. Subsections (ii) and (iii) of 19 U.S.C. § 1677a(f)(C)'s "total expense" definition lead to such a conclusion because both subsections refer to "expenses incurred with respect to the narrowest category of merchandise . . . which includes the subject merchandise." See id., 24 CIT at ___, 104 F. Supp. 2d at 135. The term "subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921." 19 U.S.C. § 1677(25) (1994). Accordingly, the Court finds that Commerce reasonably interpreted 19 U.S.C. § 1677a(f) in refusing to apply a narrower subcategory of merchandise such as one based on LOT. The Court, moreover, agrees with Commerce's conclusion that a subdivision of the "CEP profit calculation would

be more susceptible to manipulation," a result that Congress specifically warned Commerce to prevent. Final Results, 63 Fed. Reg. at 63,866. Finally, the Court agrees with Commerce that NTN failed to provide adequate factual support of how the CEP profit calculation was distorted by Commerce's standard methodology.

## IV. Commerce's Decision to Include Profits From Export Price Sales in the Calculation of CEP Profit

### A. Background

Under 19 U.S.C. § 1677a(d)(3), Commerce must, in order to calculate CEP, deduct "the profit allocated to the expenses described in" 19 U.S.C. §§ 1677a(d)(l) and (2) from the price charged to the first unaffiliated purchaser in the United States. "Profit" is defined as "an amount determined by multiplying the total actual profit by the applicable percentage," 19 U.S.C. § 1677a(f)(1), and "actual profit" is defined as the "total profit earned . . . with respect to the sale of the same merchandise for which total expenses are determined . . . ." 19 U.S.C. § 1677a(f)(2)(D). The term "total expenses" means "all expenses in the first of [three] categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise . . . ." 19

U.S.C. § 1677a(f)(2)(C). The first category covers "expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country . . . ." 19 U.S.C. § 1677a(f)(2)(C)(i). "Subject merchandise," in turn, is defined as "the class or kind of merchandise that is within the scope of . . . a review . . . ." 19 U.S.C. § 1677(25).

In the <u>Final Results</u>, Commerce included export price ("EP") sales in the calculation of CEP profit. <u>See generally</u>, 63 Fed. Reg. at 63,866.

### B. Contentions of the Parties

NTN contends that the statute clearly states that the adjustment of profit to the CEP is to be based on expenses incurred in the United States as a percentage of total expenses and that there is no provision in the statute for the inclusion of EP expenses or profit in this calculation. <u>See</u> NTN's Mem. at 20-22. NTN deduces, therefore, that Commerce erred by including EP sales in the calculation of CEP profit. <u>See id.</u> at 20.

Specifically, NTN relies on the definition of the term "total expenses." <u>See</u> 19 U.S.C. § 1677a(f)(2)(C). NTN maintains that the specific reference to CEP within the definition precludes Commerce from the inclusion of EP expenses in the calculation of CEP profit. <u>See generally</u> NTN's Mem. at 20-21. NTN further states that "just

as EP expenses cannot be considered, it follows logically that sales revenue for EP sales also cannot be included" in the calculation of CEP profit since the definition of "total actual profit," 19 U.S.C. § 1677a(f)(2)(D), "directly references the definition of total expenses." Id. at 21-22. NTN, therefore, requests that EP sales be removed from NTN's CEP profit adjustment calculation. See id. at 22.

Commerce contends that the inclusion of revenues and expenses resulting from NTN's EP sales in the calculation of CEP profit was in accordance with law because it was a reasonable interpretation of the statutory mandates of sections 1677a(f)(2)(C) and (D) and 1677(25) of Title 19. See Def.'s Mem. at 25-27. Specifically, Commerce points out that the term "subject merchandise" is defined as "'the class or kind of merchandise that is within the scope of . . . a review. . . .'" Id. at 26-27 (quoting 19 U.S.C. § 1677(25)). Commerce notes that the term "subject merchandise" is referred to in the statute that defines "total expenses," see 19 U.S.C. § 1677a(f)(2)(C)(i), and therefore "total expenses" encompasses NTN's EP and CEP sales. See Def.'s Mem. at 28. Commerce further articulates that:

> [Commerce's September 4, 1997] Policy Bulletin . . .
> indicates that section [1677a(f)(2)(D)] . . . clearly
> states that the calculation of total actual profit is to
> include all revenues and expenses resulting from the
> respondent's EP sales as well as from its CEP and home
> market sales. The basis for total actual profit is the

> same as the basis for total expenses under [19 U.S.C. §
> 1677a(f)(2)(C)]. The first alternative under [19 U.S.C.
> § 1677a(f)(2)(C)] states that, for purposes of
> determining profit, the term "total expenses" refers to
> all expenses incurred with respect to the subject
> merchandise sold in the United States (as well as in the
> home market). Thus, where the respondent makes both EP
> and CEP sales to the United States, sales of the subject
> merchandise would necessarily encompass all such
> transactions. Therefore, as in the <u>95/96 TRB Final</u>, [63
> Fed. Reg. 2558], because NTN had EP sales, [Commerce] .
> . . included these sales in the calculation of CEP
> profit.

<u>Final Results</u>, 63 Fed. Reg. at 63,866.

Timken agrees with Commerce and contends that Commerce
reasonably calculated CEP profit on the basis of all United States
sales, including EP sales. <u>See</u> Timken's Resp. at 18-19.


### C. Analysis

Based upon the above-defined statutory scheme, Commerce
concluded that where a respondent made both EP and CEP sales,
"sales of the subject merchandise" encompassed all such
transactions and, therefore, Commerce could "reasonably interpret[]
the statutory scheme as providing that the calculation of total
actual profit is to include all revenues and expenses resulting
from the respondent's EP sales as well as from its CEP and home
market sales." Def.'s Mem. at 27. Commerce's September 4, 1997
Policy Bulletin provides:

> The calculation of total actual profit under [19 U.S.C.
> § 1677a(f)(2)(D)] includes all revenues and expenses

resulting from the respondent's [EP] sales as well as from its constructed export price and home market sales . . . . The basis for total actual profit is the same as the basis for total expenses under [19 U.S.C. § 1677a(f)(2)(C)]. The first alternative under this section . . . states that, for purposes of determining profit, the term "total expenses" refers to all expenses incurred with respect to the subject merchandise sold in the United States (as well as home market expenses). Thus, where the respondent makes both EP and CEP [sales], sales of the subject merchandise would encompass all such transactions.

Def.'s Mem. at 27.


The SAA further clarifies the point and states the following:

The total expenses are all expenses incurred by or on behalf of the foreign producer and exporter and the affiliated seller in the United States with respect to the production and sale of the first of the following alternatives which applies: (1) the subject merchandise sold in the United States and the foreign like product sold in the exporting country (if Commerce requested this information in order to determine the normal value and the constructed export price) . . . .

H.R. Doc. 103-316 at 824.


Based upon its interpretation of the statutory language and upon the SAA's reference to CEP, NTN claims that there are only two categories of expenses that Commerce could use in calculating CEP profit: those used to calculate NV and those used to calculate CEP. See NTN's Mem. at 21. Additionally, NTN states that just as EP expenses cannot be used in calculating CEP profit, neither can sales revenue be used for EP sales since the definition of "total actual profit" under 19 U.S.C. § 1677a(f)(2)(D) refers to the

definition of "total expenses" in 19 U.S.C. § 1677a(f)(2)(C).  See id. at 21-22.

NTN, however, ignores two issues.  To start, the first category of total expenses under 19 U.S.C. § 1677a(f)(2)(C) is not limited to expenses incurred with respect to CEP sales made in the United States and the foreign like product sold in the exporting country.  It also covers expenses incurred with respect to EP sales because it refers to "expenses incurred with respect to the subject merchandise sold in the United States."  The term "subject merchandise" is defined in 19 U.S.C. § 1677(25) as the class or kind of merchandise that is within the scope of a review; and the class or kind of merchandise in this review includes both CEP and EP sales.

Second, as the SAA explains, the total expenses are all expenses incurred with respect to the production and sale of the first of the three alternatives.  In referring to the first category of expenses, the SAA specifically refers to "the subject merchandise sold in the United States," which by definition means the class or kind of merchandise which is within the scope of a review and, in this review, includes both CEP and EP sales.  H.R. Doc. 103-316 at 824.

For these reasons the Court is not convinced by NTN's argument that Commerce's interpretation of the statutory scheme is unreasonable and sustains Commerce's inclusion of EP sales in the calculation of CEP profit.  See Chevron, 467 U.S. 837.

**V.    Commerce's Use of Affiliated Supplier's Cost
       of Production for Inputs When the Cost Was
       Higher Than the Transfer Price**

**A.    Background**

During the review at issue, Commerce used the higher of the transfer price or the actual cost in calculating cost of production ("COP") and CV in situations involving inputs that NTN had obtained from affiliated producers.  See Final Results, 63 Fed. Reg. at 63,868.  In the Final Results, Commerce stated that

> [Commerce] disagree[s] with NTN's contention that it is not appropriate for [Commerce] to rely on section [19 U.S.C. § 1677b(f)(2) (1994) and 19 U.S.C. § 1677b(f)(3) (1994)] in [the case at bar].  [Commerce] note[s] that section 351.407 (a) and (b) [(1998)] of [Commerce's] regulations sets forth certain rules that are common to the calculation of CV and COP.  This section states that for the purpose of section [19 U.S.C. § 1677b(f)(3)] . . . [Commerce] will determine the value of a major input purchased from an affiliated person based on the higher of: (1) the price paid by the exporter or producer to the affiliated person for the major input; (2) the amount usually reflected in sales of the major input in the market under consideration; or (3) the cost to the affiliated person of producing the major input.
>
> Furthermore, [Commerce] ha[s] relied on this methodology in [previous determinations] . . . .  In each of these determinations [Commerce] concluded that in the case of a transaction between affiliated persons

involving a major input, [Commerce] will use the highest of the transfer price between the affiliated party, the market price between unaffiliated persons involving the major input, or the affiliated supplier's cost of producing this input.

Accordingly, for the Final Results, [Commerce] ha[s] continued to rely on the higher of transfer price or actual cost for NTN's affiliated-party inputs when calculating COP and CV.

Id. (citations omitted).

## B.    Contentions of the Parties

NTN contends that Commerce "erroneously adjusted NTN's COP and CV for affiliated party inputs."  NTN's Mem. at 22; see NTN's Mem. at 4-5, 22-24; NTN's Reply at 7-8.  In particular, NTN maintains that: (1) there is no record evidence that the affiliated party inputs did "not reflect the amount usually reflected in sales of this merchandise in the market under consideration," NTN's Mem. at 24, see also, NTN's Mem. at 22-23 (relying on 19 U.S.C. § 1677b(f)(2)); and (2) the Final Results, 63 Fed. Reg. at 63,868, "make no reference to any record evidence which would give [Commerce] reasonable grounds to believe that the reported [COP] of the affiliated party inputs in question was less than the actual [COP]."  NTN's Mem. at 23.  Moreover, according to NTN, a plain language reading of 19 U.S.C. § 1677b(f) (1994) makes clear that "the automatic recalculation of reported COP and CV data contemplated in 19 C.F.R. § 351.407 [(1998)] is not contemplated in

the statute itself." Id. NTN, therefore, requests that this Court "hold 19 C.F.R. [§] 351.407 invalid as a matter of law . . . and remand this case to [Commerce] to restore NTN's reported affiliated party input data in calculating COP and CV." NTN's Reply at 8.

Commerce argues that its "use of the affiliated supplier's COP for major inputs rather than the transfer prices is supported by substantial record evidence and otherwise in accordance with law." Def.'s Mem. at 30; see Def.'s Mem. at 29-40. Commerce further argues that NTN's contentions are without merit. See id. at 37-40. Specifically, Commerce maintains inter alia that: (1) Commerce did provide its reasons for conducting a below-cost sales test, see id. at 38 (citing Preliminary Results, 63 Fed. Reg. at 37,347; Def.'s App. Mem. Ex. 2 at 5; and (2) "Commerce has properly exercised the discretion granted to [Commerce] in 19 U.S.C. § 1677b(f)(3) to analyze the cost of major inputs purchased by a producer from its affiliated suppliers when [Commerce] initiates a COP investigation pursuant to 19 U.S.C. § 1677b(b)(1) without a separate below-COP allegation with respect to inputs." Def.'s Mem. at 39.

Timken supports Commerce's position and adds that "the statute provides Commerce the authority to request cost data for inputs."[11]

---

[11] In its reply brief, NTN maintains that "Timken has misapprehended NTN's argument" because "NTN does not argue that [Commerce] may not request such data . . . [but] [i]nstead, NTN

(continued...)

Timken's Resp. at 22; see id. at 20-24.


    **C.   Analysis**

    The special rules for the calculation of COP and CV contained

in the pertinent provision state that, in a transaction between

affiliated persons, either the transaction or the value of a major

input may be disregarded.  See 19 U.S.C. § 1677b(f).  The part of

the statutory provision addressing transactions that may be

disregarded reads as follows:

> A transaction directly or indirectly between affiliated
> persons may be disregarded if, in the case of any element
> of value required to be considered, the amount
> representing that element does not fairly reflect the
> amount usually reflected in sales of merchandise under
> consideration in the market under consideration.  If a
> transaction is disregarded under the preceding sentence
> and no other transactions are available for
> consideration, the determination of the amount shall be
> based on the information available as to what the amount
> would have been if the transaction had occurred between
> persons who are not affiliated.

19 U.S.C. § 1677b(f)(2).


    The so-called "major input rule," or the part of the statutory

provision addressing the value of a major input that may be

disregarded, states, in turn, that,

---

[11](...continued)
argues that what [Commerce] did with the information was
unsupported by the statute and unreasonable."  NTN's Reply at 8.
Therefore, the Court will not address Timken's argument regarding
whether Commerce may request cost data for inputs.

> [i]f, in the case of a transaction between affiliated
> persons involving the production by one of such persons
> of a major input to the merchandise, [Commerce] has
> reasonable grounds to believe or suspect that an amount
> represented as the value of such input is less than the
> cost of production of such input, then [Commerce] may
> determine the value of the major input on the basis of
> the information available regarding such cost of
> production, if such cost is greater than the amount that
> would be determined for such input under paragraph [19
> U.S.C. § 1677b(f)(2)].

19 U.S.C. § 1677b(f)(3).

One of the elements of value to be considered in the calculation of COP, which is referred to in Section 1677b(f)(2), is the cost of manufacturing and fabrication. See 19 U.S.C. § 1677b(b)(3)(A) (1994). Section 1677b(b)(3)(A) shall be read in conjunction with 19 U.S.C. §§ 1677b(f)(2) and 1677b(f)(3) that authorize Commerce, in calculating COP and CV, to: (1) disregard a transaction between affiliated persons if the amount representing an element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration; and (2) determine the value of the major input on the basis of the information available regarding COP if Commerce has reasonable grounds to believe or suspect that an amount represented as the value of the input is less than the COP of the input.

In determining whether transaction prices between affiliated persons fairly reflect the market, Commerce's practice has been to

compare the transaction prices with market prices charged by unrelated parties. Commerce's practice was later reduced to writing in 19 C.F.R. § 351.407, a regulation which implements 19 U.S.C. § 1677b(f). Commenting on the regulation, Commerce stated that it

> believes that the appropriate standard for determining whether input prices are at arm's length is its normal practice of comparing actual affiliated party prices to or from unaffiliated parties. This practice is the most reasonable and objective basis for testing the arm's length nature of input sales between affiliated parties, and is consistent with [19 U.S.C. § 1677b(f)(2)].

Def.'s Mem. at 33 n.3 (citation omitted).

Pursuant to the major input rule contained in 19 U.S.C. § 1677b(f)(3), in calculating COP or CV, Commerce values a major input purchased from an affiliated supplier using the highest of the following: (1) the transfer price between the affiliated parties; (2) the market price between unaffiliated parties; and (3) the affiliated supplier's COP for the major input, since, in Commerce's view, the affiliation between the respondent and its suppliers "'creates the potential for the companies to act in a manner that is other than arm's length' and gives Commerce reason to analyze the transfer prices for major inputs." Def.'s Mem. at 33-34 (quoting Final Results of Antidumping Duty Administrative Review of Silicomanganese From Brazil, 62 Fed. Reg. 37,869, 37,871-72 (July 15, 1997)). In addition, if Commerce disregards sales

that failed the below-cost sales test pursuant to 19 U.S.C. § 1677b(b)(1) in the prior review with respect to merchandise of the respondent being reviewed, Commerce has "reasonable grounds to believe or suspect" that sales under consideration might have been made at prices below the COP. See 19 U.S.C. § 1677b(b)(2)(A)(ii) (1994).

Commerce disregarded sales that failed its below-cost sales test pursuant to 19 U.S.C. § 1677b(b)(1) (1994) during the previous review with respect to NTN's merchandise. See Preliminary Results, 63 Fed. Reg. at 37,347; Def.'s App. Mem. Ex. 2 at 5. For this reason, Commerce concluded that it had reasonable grounds to believe or suspect that sales of the foreign like product under consideration may have been made at prices below the COP. Accord 19 U.S.C. § 1677b(b)(2)(A)(ii). Therefore, pursuant to 19 U.S.C. § 1677b(b)(1), Commerce initiated a COP investigation of sales by NTN in the home market. See Preliminary Results, 63 Fed. Reg. at 37,347. As part of its investigation, Commerce distributed a questionnaire, which, in pertinent part, requested NTN to provide COP and CV information. See Def.'s Mem. at 36. Specifically, Commerce requested NTN to: (1) "list all inputs used to produce the merchandise" under review; (2) "identify those inputs that NTN received from affiliated" persons; (3) "provide the per-unit transfer price charged for the input by the affiliated" producer;

(4) provide "the per-unit [COP] incurred by the affiliated [person] in producing the major input[;]" (5) "provide documentation showing the price paid for the input by the unaffiliated purchaser" "[i]f the affiliated party sells the identical input to other, unaffiliated purchasers[;]" (6) "provide documentation showing the unaffiliated party's sales price for the input[,]" "[i]f NTN purchases the identical input from unaffiliated suppliers[;]" and (7) "specify the basis used by NTN to value each major input for purposes of computing the submitted COP and CV amounts." Id. In response, NTN referred Commerce to a number of NTN's exhibits and stated, among other things, that transfer price was used in computing COP and CV. See Def.'s Supplemental App. at D-1 to D-5. NTN also indicated that, for submission purposes, NTN used the transfer price for computing COP and CV. See Def.'s Mem. at 36. Therefore, consistent with its interpretation of 19 U.S.C. §§ 1677f(2) and 1677f(3), Commerce used the higher of the transfer price or the actual cost in calculating COP and CV in the situations where NTN used parts purchased from affiliated persons. See id. at 36-37 (citing Def.'s App. Mem. Ex. 2 (proprietary version)).

While NTN argues that there is no record evidence that the affiliated party inputs did "not reflect the amount usually reflected in sales of this merchandise in the market under

consideration," NTN's Mem. at 24; see also NTN's Mem. at 22-23

(relying on 19 U.S.C. § 1677b(f)(2)), the Court holds that Commerce

acted reasonably and in accord with 19 U.S.C. § 1677b(f)(3) when it

recalculated NTN's COP and CV using the affiliated supplier's COP

for inputs when it was higher than the reported transfer price.[12]

See Final Results, 63 Fed. Reg. at 63,868; see NSK Ltd. v. United

States, 26 CIT ___, ___, 217 F. Supp. 2d. 1291 (2002); NTN 2002, 26

CIT ___, 186 F. Supp. 2d 1257; SKF USA Inc. v. United States, 24

CIT ___, 116 F. Supp. 2d 1257 (2000).


**VI. Commerce's Recalculation of NTN's Home Market and United States Indirect Selling Expenses Without Regard to Level of Trade**

    **A.    Background**

In its preliminary calculations, Commerce had calculated NTN's

United States indirect selling expenses without regard to LOT.

See Final Results, 63 Fed. Reg. at 63,869-70.  NTN argued that

Commerce should have relied on NTN's reported United States and

---

[12]  The Court does not reach NTN's argument that 19 C.F.R. § 351.407 should be held invalid because it is "inconsistent with [19 U.S.C. § 1677b(f)] insofar as the regulation[] do[es] not require any reasonable grounds to believe that the reported COP is less than the actual COP." NTN's Mem. at 23-24.  As Commerce correctly points out, "[w]hile the regulation on its face does not require reasonable grounds to believe or suspect that the reported COP is less than the actual COP, in this case, Commerce had, in fact, such reasonable grounds to believe or suspect." Def.'s Mem. at 39 (emphasis supplied); see also Preliminary Results, 63 Fed. Reg. at 37,347; Def.'s App. Mem. Ex. 2 at 5.

home market selling expenses based on LOT instead of recalculating these selling expenses without regard to LOT. See id. at 63,869. Timken, in turn, contended that Commerce should reject NTN's selling expense allocations based on LOT because such allocations bear no relationship to the way in which NTN incurs the expenses. See id. at 63,870; see also Timken's Resp. at 25-27.

Commerce responded that for a majority of the expenses under this POR, it determined that NTN's methodology for allocating its selling expenses based on LOTs did not bear any relationship to the manner in which NTN incurred these United States and home market selling expenses. See Final Results, 63 Fed. Reg. at 63,870. Commerce asserts that in Timken Co. v. United States ("Timken I"), 20 CIT 645, 930 F. Supp. 621 (1996), Commerce was to accept "NTN's LOT-specific allocations and per-unit LOT expense adjustment amounts only if NTN's expenses demonstrably varied according to LOT." Id. (citing Timken I, 20 CIT at 653, 930 F. Supp. at 628). Acting in accordance with Timken I, Commerce in its remand results did not allow NTN's LOT specific allocations "due to the lack of quantitative and narrative evidence on the record demonstrating that the expenses in question demonstrably varied according to LOT." Final Resutls, 63 Fed. Reg. at 63,870. During this POR, since Commerce found that NTN did not provide "quantitative and narrative evidence" that its selling expenses are attributable to

levels of trade, except for certain United States and home market packing material and packing labor expenses, Commerce recalculated NTN's United States and home market selling expenses without regard to LOT.[13]  See id. at 63,870-71.

### B.    Contentions of the Parties

NTN alleges that in the Final Results, 63 Fed. Reg. at 63,869-71, Commerce erroneously recalculated NTN's United States and home market indirect selling expenses without regard to LOT.  See NTN's Mem. at 5, 24-27.  NTN contends that Commerce's decision to reallocate NTN's selling expenses violates Commerce's mandate to administer the antidumping laws.  See id. at 26-27.  In particular,

_____

[13] In support of its methodology, Commerce points out that the Court in NTN Bearing Corp. of Am. v. United States, 19 CIT 1221, 905 F. Supp. 1083 (1995), stated that "'[a]lthough NTN purports to show that it incurred different selling expenses at different trade levels, the record demonstrates that NTN's allocation methodology does not reasonably quantify the expenses incurred at each level of trade.'"  See Def.'s Mem. at 42 (quoting NTN, 19 CIT at 1234, 905 F. Supp. at 1094-95); see also Def.'s Mem. at 42-43.

In the Final Results, Commerce also clarified that:

[Commerce] note[s] NTN's comment that [Commerce] disallowed NTN's allocations of certain home market expenses solely due to the allegedly complex nature of NTN's LOT-specific methodology.  It is not [Commerce's] current practice to reject such allocations on the basis of complexity; however, [Commerce] inadvertently indicated in [Commerce's] Preliminary Analysis Memo at 7 that it is [Commerce's] policy to do so.

Final Results, 63 Fed. Reg. at 63,870-71 (emphasis supplied).

NTN notes that: (1) "[t]here is ample evidence on the record for [Commerce] to determine that indirect selling expenses, in fact, varied across levels of trade," id. at 25 (relying on NTN's App. Mem. Attach. 6 at Exs. B-3, B-4 and C-7) (proprietary version); and (2) Commerce has accepted NTN's methodology of allocating its selling expenses based on LOT in previous reviews.  NTN's Mem. at 26 (citing Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Finding on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 61 Fed. Reg. 57,629, 57,636 (Nov. 7, 1996)).  Moreover, NTN contends that such reallocation has the effect of voiding Commerce's LOT determination that different LOTs exist in the United States and Japan.  See NTN's Mem. at 26.

Commerce responds that except for certain United States and home market packing material and packing labor expenses, "'[Commerce] denied NTN's allocations because the record lacked quantitative and narrative evidence that the expenses in question varied demonstrably according to LOT.'"  Def.'s Mem. at 41 (quoting Final Results, 63 Fed. Reg. at 63,871).  Commerce asserts that NTN only quantified the allocation itself and, therefore, the Court should sustain Commerce's recalculation of NTN's United States and home market selling expenses.  See Def.'s Mem. at 43.

Timken supports Commerce and argues that Commerce was correct in rejecting NTN's allocation of United States and home market selling expenses on an LOT specific basis because "there was no evidence demonstrating that NTN's expenses varied according to level of trade."  Timken's Resp. at 25; see also Timken's Resp. at 25-27.


### C.   Analysis

The Court disagrees with NTN that it adequately supported its LOT adjustment claim for its reported United States and home market selling expenses.  Although NTN purports to show that it incurred different selling expenses at different trade levels, the evidence to which it points does not show that its allocation methodology reasonably quantifies the United States and home market selling expenses incurred at different LOTs.  See NSK Ltd., 26 CIT at ___, 217 F. Supp. 2d. at 1323; NTN 2002, 26 CIT at ___, 186 F. Supp. 2d at 1267-68; NTN 2000, 24 CIT at ___, 104 F. Supp. 2d at 131-33; NTN, 19 CIT at 1234, 905 F. Supp. at 1094-95.  Given that NTN had the burden before Commerce to establish its entitlement to an LOT adjustment, its failure to provide the requisite evidence compels the Court to conclude that it has not met its burden of demonstrating that Commerce's denial of the LOT adjustment was not supported by substantial evidence and was not in accordance with law.  See NSK Ltd. v. United States, 21 CIT 617, 635-36, 969 F.

Supp. 34, 53-54 (1997), aff'd, NSK Ltd. v. Koyo Seiko Co., Ltd.,
190 F.3d 1321, 1330 (Fed. Cir. 1999).

Accordingly, the Court sustains Commerce's recalculation of
NTN's United States and home market selling expenses without regard
to level of trade.

## VII. Commerce's Denial of Price-Based LOT Adjustment for CEP Sales

NTN contends that Commerce improperly denied a price-based LOT
adjustment for CEP sales made in the United States market at an LOT
different from the home market sales.[14] See NTN's Mem. at 5, 27-29;
NTN's Reply at 11-12. In particular, NTN argues, inter alia, that
Commerce incorrectly determined NTN's CEP LOT because Commerce
failed to use the sale to the first unaffiliated purchaser in the
United States to determine NTN's CEP LOT. See NTN's Mem. at 28.
In other words, according to NTN, if Commerce had used the CEP
starting price, that is, without any 19 U.S.C. § 1677a(d)
adjustment, to determine CEP LOT, NTN would have satisfied the
statutory requirements for an LOT adjustment for its CEP sales.
See NTN's Reply at 11-12. Relying on Borden, Inc. v. United
States, 22 CIT 233, 4 F. Supp. 2d 1221 (1998), rev'd, 2001 WL

---

[14] For a complete discussion of background information and the
statutory provisions at issue, the reader is referred to this
Court's decision in NTN 2000, 24 CIT at ___, 104 F. Supp. 2d at
125-28.

312232 (Fed. Cir. Mar. 12, 2001), NTN argues that Commerce erred by determining the CEP level of trade after deducting expenses and profit pursuant to 19 U.S.C. § 1677a(d). See NTN's Mem. at 28-29; NTN's Reply at 9-11. NTN, therefore, requests that the Court remand the LOT issue to Commerce to determine NTN's CEP LOTs prior to any 19 U.S.C. § 1677a(d) deductions and, afterwards, to grant NTN a price-based LOT adjustment for its CEP sales. See NTN's Mem. at 29; NTN's Reply at 10-12.

Commerce, in turn, argues that it properly determined the LOT for NTN's CEP sales after deducting expenses and profit from the price to the first unaffiliated purchaser in the United States pursuant to 19 U.S.C. § 1677a(d) because 19 U.S.C. § 1677b(a)(7)(A), which provides for an LOT adjustment, requires Commerce to compare CEP, not the "unadjusted" starting price of CEP, with NV. See Def.'s Mem. at 43, 45-60; Final Results, 63 Fed. Reg. at 63,871. Commerce points out that CEP is defined in 19 U.S.C. § 1677a(b) (1994) as the price to the unaffiliated purchaser in the United States as adjusted under 19 U.S.C. § 1677a(d). See Def.'s Mem. at 46-47. According to Commerce, the adjusted CEP price is to be compared to prices in the home market based on the same LOT whenever it is practicable; when it is not practicable and the LOT difference affects price comparability, Commerce makes an LOT adjustment. See id. at 49-50. Commerce makes a CEP offset

when Commerce "is not able to quantify price differences between the CEP [LOT] and the [LOT] of the comparison sales, and if NV is established at a more advanced stage of distribution than the CEP [LOT]." Id. at 50. If the CEP price is not adjusted before it is compared under the approach advocated by NTN, "there will always be substantial deductions from the resale prices in the United States (because they are mandatory)," but they "will be compared to resale prices in the home market from which there will virtually never be any equivalent deductions," thus creating a substantial imbalance and a skewed comparison between NV and CEP. Id. at 54 (emphasis in original).

Therefore, Commerce claims that it properly denied an LOT adjustment for NTN's CEP sales because NTN did not have a home market LOT equivalent to the CEP LOT, making it impossible for Commerce to quantify the difference in price between the CEP LOT and the home market LOT. See id. at 43-44 (citing Def.'s App. Mem. Ex. 2 at 6-7) (proprietary version); see also Final Results, 63 Fed. Reg. at 63,871. Because the home market LOT was at a more advanced stage of distribution than the CEP LOT, Commerce made a CEP offset pursuant to 19 U.S.C. § 1677b(a)(7)(B). See Def.'s Mem. at 44, 61 (citing Def.'s App. Mem. Ex. 2 at 6-7) (proprietary version).

Timken generally agrees with Commerce's positions. See Timken's Resp. at 28-30.

In Micron Tech., Inc. v. United States, 243 F.3d 1301 (Fed. Cir. 2001), the Court of Appeals for the Federal Circuit ("CAFC") held that the plain text of the antidumping statute and the SAA require Commerce to deduct the expenses enumerated under 19 U.S.C. § 1677a(d) before making the LOT comparison.[15] The court examined 19 U.S.C. § 1677b(a)(1)(B)(i) (1994), which provides that Commerce must establish NV "to the extent practicable, at the same level of trade as the export price or [CEP]," and 19 U.S.C. § 1677a(b), which defines CEP as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States . . .as adjusted under subsections (c) and (d) of this section." (Emphasis supplied). The court concluded that, "[as] [r]ead together, these two provisions show that Commerce is required to deduct the subsection (d) expenses from the starting price in the United States before making the level of trade comparison." Micron, 243 F.3d at 1315. The court further stated that this conclusion is mandated by the SAA, which states that "'to the extent practicable, [Commerce should] establish normal value based on home market (or

---

[15] The CAFC's decision effectively overturned the Court of International Trade's determination with respect to this issue in Borden, 22 CIT 233, 4 F. Supp. 2d 1221, a case discussed by the parties in the instant matter.

third country) sales at the same level of trade as the constructed export price or the starting price for the export price.'" Id. (citing SAA at 829) (emphasis omitted).

Thus, the Court finds that Commerce properly made 19 U.S.C. § 1677a(d) adjustments to NTN's starting price in order to arrive at CEP and make its LOT determination.  The Court also finds that Commerce's decision to deny NTN an LOT adjustment is supported by substantial evidence.  Section 1677b(a)(7)(A) permits Commerce to make an LOT adjustment "if the difference in level of trade . . . involves the performance of different selling activities[] and . . . is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined."  With respect to CEP sales, Commerce, examined the record and found that "NTN had no home market level of trade equivalent to the CEP level of trade because there were significant differences between the selling activities associated with the CEP and those associated with each of the home market levels of trade."  Def.'s Mem. at 43 (citing Def.'s App. Mem. Ex. 2 at 6-7) (proprietary version).  "As a result, because [Commerce] lacked the information necessary to determine whether there is a pattern of consistent price differences between the relevant LOTs, [Commerce] did not make a LOT adjustment for NTN when [Commerce] matched a CEP sale to a sale

of the foreign like product at a different LOT." <u>Final Results</u>, 63 Fed. Reg. at 63,871.  Moreover, "Commerce had no other information that provided an appropriate basis for determining a level-of-trade adjustment."  Def.'s Mem. at 60-61; <u>see also</u> SAA at 830.  Consequently, with respect to the CEP sales where Commerce was unable to quantify an LOT adjustment, Commerce, in accordance with 19 U.S.C. § 1677b(a)(7)(B), granted a CEP offset to NTN because the home market sales were at a more advanced LOT than the sales to the United States.  <u>See id.</u> at 44, 61; <u>see also</u> Def.'s App. Mem. Ex. 2 at 7.  Based on the foregoing, the Court finds that Commerce acted within the directive of the statute in denying the LOT adjustment and granting a CEP offset instead.  <u>See</u> 19 U.S.C. § 1677b(a)(7).

## VIII.  Commerce's Exclusion of Certain Home Market Sales to Affiliated Parties From the Normal Value Calculation

### A.    Background

During the POR, Commerce conducted its standard arm's length test in order to determine whether NTN's affiliated party sales could be used for purposes of calculating NV.  <u>See</u> <u>Final Results</u>, 63 Fed. Reg. at 63,872; <u>see also</u> <u>Preliminary Results</u>, 63 Fed. Reg. at 37,346-47 (setting forth Commerce's 99.5% arm's length test).  Commerce, in accordance with 19 U.S.C. § 1677b(a)(5)(1994) and 19 C.F.R. § 351.403(c) (1998), disregarded those NTN sales made to affiliated customers in its computation of NV which were not at

arm's length.  See Preliminary Results, 63 Fed. Reg. at 37,346; see also Final Results, 63 Fed. Reg. at 63,871-72; Def.'s Mem. at 5, 61-65.


### B.    Contentions of the Parties

NTN contends that Commerce erred in applying the arm's length test when it "compare[d] the weighted average price for unrelated sales to the price for individual related sales."  NTN's Mem. at 29.  To illustrate its contention, NTN provides a hypothetical example attempting to demonstrate that Commerce's arm's length test is distortive.  See id. at 30.  Alternatively, NTN asserts that, should Commerce choose to retain its methodology of comparing individual sales to a weighted average margin, Commerce should lower the percentage of the arm's length test to "95% to reflect the true range of arm's length prices in these transactions and compensate for the distortive nature of the test."  Id.

NTN also argues that Commerce's arm's length test was unreasonable since Commerce should have examined factors other than price in determining whether to include affiliated party sales when calculating NV.  See NTN's Mem. at 30-31.  Specifically, NTN contends that Commerce failed to examine: (1) "quantity of goods"; and (2) "payment terms."  Id.; see also NTN's Reply at 18-19.

Commerce responds that 19 U.S.C. § 1677b(a)(5) provides that:

> [i]f the foreign like product is sold or, in the absence
> of sales, offered for sale through an affiliated party,
> the prices at which the foreign like product is sold (or
> offered for sale) by such affiliated party may be used in
> determining normal value.

Def.'s Mem. at 63 (quoting 19 U.S.C. § 1677b(a)(5) (emphasis in

original)).

Relying on the language of 19 U.S.C. § 1677b(a)(5), Commerce

argues that it has "broad discretion in devising its own

methodology for determining when to use affiliated-party prices in

determining NV."[16]  Def.'s Mem. at 63.  Moreover, in the Final

Results, Commerce states that

> [Commerce's] 99.5 percent arm's-length test is a
> reasonable method for establishing a fair basis of
> comparison between affiliated- and unaffiliated-party
> sales. . . .   Furthermore, the CIT has upheld the
> validity of [Commerce's] arm's-length test on numerous
> occasions. . . .
>
>     NTN has not provided any information on the record
> to support its assertion that [Commerce's] arm's-length
> test is distortive or unreasonable.  Therefore, because

---

[16]  In addition, Commerce points out the regulation provides
the following:

> If an exporter or producer sold the foreign like product
> to an affiliated party, [Commerce] may calculate normal
> value based on that sale only if satisfied that the price
> is comparable to the price at which the exporter or
> producer sold the foreign like product to a person who is
> not affiliated with the seller.

Def.'s Mem. at 63 (quoting 19 C.F.R. § 351.403(c)).

> NTN has failed to demonstrate that the 99.5 percent threshold produces distortive results or that [Commerce's] methodology is unreasonable, in accordance with the CIT decisions . . . and the 95/96 TRB Final, [63 Fed. Reg. 2558], [Commerce] ha[s] not altered [Commerce's] 99.5 percent arm's-length test for these final results.

Id. at 61-62 (quoting Final Results, 63 Fed. Reg. at 63,872, citing in turn Micron Tech., Inc. v. United States, 19 CIT 829, 846-47, 893 F. Supp. 21, 38 (1995), NTN, 19 CIT at 1241, 905 F. Supp. at 1100, Usinor Sacilor v. United States, 18 CIT 1155, 1159, 872 F. Supp. 1000, 1004 (1994)); see also Def.'s Mem. at 65 (citing NTN Bearing Corp. of Am. v. United States, 23 CIT 486, 497-99, 83 F. Supp. 2d 1281, 1291-92 (1999), and NSK Ltd., 21 CIT at 636-37, 969 F. Supp. at 54-55). Timken supports Commerce's contentions. See Timken's Resp. at 31-34.


     C.   Analysis

     The Court disagrees with NTN that Commerce's arm's length test is unreasonable. In NTN 2002, 26 CIT at ___, 186 F. Supp. 2d at 1288, this Court upheld Commerce's application of the arm's length test to exclude certain home market sales to affiliated parties from the NV calculation. The Court noted that under the applicable statute, 19 U.S.C. § 1677b(a)(5), Commerce is allowed considerable discretion in deciding whether to include affiliated party sales when calculating NV. See NTN 2002, 26 CIT at ___, 186 F. Supp. 2d at 1287 (citing Usinor, 18 CIT at 1158, 872 F. Supp. at 1004). The

Court further noted that it has repeatedly upheld Commerce's arm's length test on the basis that respondents have failed to present "'record evidence tending to show that . . . Commerce's test was unreasonable.'" Id., 26 CIT at ___, 186 F. Supp. 2d at 1287 (quoting NTN, 19 CIT at 1241, 905 F. Supp. at 1100, and citing Torrington Co. v. United States, 21 CIT 251, 261, 960 F. Supp. 339, 348 (1997), NSK Ltd., 190 F.3d at 1328).

Because Commerce's application of the arm's length test to exclude certain home market sales to affiliated parties from the NV calculation and the parties' arguments are practically identical to those presented in NTN 2002, 26 CIT at ___, 186 F. Supp. 2d at 1287-88, the Court adheres to its reasoning in NTN 2002. Accordingly, the Court finds that Commerce's application of the arm's length test to exclude certain home market sales to affiliated parties from the NV calculation is reasonable, is in accordance with law and is supported by substantial evidence.

**IX. Commerce's Decision to Include in United States Sales Database Sample Transactions That Were Allegedly Made for No Consideration**

**A. Background**

In order to calculate a respondent's margin of dumping, Commerce compares NV with export price ("EP") or CEP. EP and CEP are defined in 19 U.S.C. § 1677a(a) and (b) (1994), respectively.

Each definition refers to the price at which the subject merchandise "is first <u>sold</u> . . . ." 19 U.S.C. § 1677a(a) and (b) (emphasis supplied). In <u>NSK Ltd. v. United States</u>, 115 F.3d 965 (Fed. Cir. 1997), the CAFC held that the usage of the term "sale" in 19 U.S.C. § 1677a(a) and (b) indicates a reference to a transaction involving a material consideration. Specifically, the CAFC clarified that, in order to be considered a sale within the meaning of the antidumping law, a transaction must involve "both a transfer of ownership to an unrelated party and consideration." <u>NSK</u>, 115 F.3d at 975.

In accordance with <u>NSK</u>, 115 F.3d at 975, Commerce revised its policy with respect to sales of sample products. In the <u>Final Results</u>, Commerce explained:

> In light of the CAFC's opinion, [Commerce] ha[s] revised [its] policy with respect to [sales of] samples. [Commerce] will now exclude from its dumping calculations sample transactions for which a respondent has established that there is either no transfer of ownership or no consideration.
>
> This new policy does not mean that [Commerce] automatically will exclude from its analysis any transaction to which a respondent applies the label "sample." In fact, for these reviews, [Commerce] determined that there were instances where it [was] appropriate not to exclude such alleged samples from [Commerce's] dumping analysis. It is well-established that the burden of proof rests with the party making a claim and in possession of the needed information.

<u>Final Results</u>, 63 Fed. Reg. at 63,872 (citations omitted); <u>see, e.g.</u>, <u>Later Ruling</u>, 62 Fed. Reg. at 54,070.

During the review at issue, NTN responded to Commerce's questionnaire regarding NTN's sample sales by stating that the "[s]amples [were] provided to customers for the purpose of allowing the customer to determine whether a particular product is suited to the customer's needs," NTN's App. Mem. Attach. 6 at B-14 (proprietary version), and described NTN's process of furnishing samples as follows: (1) "customers request [s]ample [s]ales," id.; (2) "[s]ample [s]ales . . . have the letters 'SS' in the prefix to the" recorded order number, id. at B-15; (3) although "[t]he customers may have purchased the same model previously, . . . this does not affect the status of subsequent sales as samples, since the purpose of the sample purchase would not be the same as those purchased in the normal course of trade [because], [f]or example, a sample would be requested for use in a new application," id.; and (4) "NTN does not keep records of the relative prices of sample sales and normal sales [and] is the manufacturer of all products sent as samples." Id. NTN also provided Commerce with a supplemental questionnaire response which it now cites to "as documentation of several zero-priced sample sales." NTN's Mem. at 32 (citing NTN's App. Mem. Attach. 2 at B1) (proprietary version).

In the Final Results,

[Commerce] examined the record to determine whether NTN's [United States] samples lacked consideration and were unable to find any information whatsoever in either NTN's narrative or sales database regarding sample

transactions. . . .   Because NTN did not provide any information in its response or elsewhere that would have aided [Commerce] in determining whether NTN received anything of value from its [United States] customers for the transactions in question, [Commerce] cannot conclude that NTN received no consideration for these alleged samples.  While NTN's database does include sales which are zero-priced, [Commerce] [is] unable to determine from the record if these transactions represent the sales which NTN apparently argues should be excluded from the [United States] database in accordance with the NSK[,115 F.3d 965] decision.  Furthermore, the mere fact that a sale has a reported unit price of zero does not establish that a transaction lacked exchange of consideration. . . .  As is evident in [Commerce's] September 15, 1997 redetermination pursuant to [NSK Ltd., 21 CIT 617, 969 F. Supp. 34] decision, NSK in that case established that its zero-priced transactions were free samples or promotional expenses, and not sales.  By contrast, in this review NTN has not provided any detailed information on the record demonstrating that its alleged zero-priced transactions were in fact samples and lacked an exchange of consideration.

[Commerce] ha[s] also evaluated whether NTN's alleged home market sample sales qualify for exclusion from the home market database in light of the CAFC's NSK[,115 F.3d 965] decision. . . . [Commerce] exclude[s] sample transactions from dumping calculations only if a respondent has demonstrated either that there is no transfer of ownership or no consideration.  Because evidence on the record clearly indicates that NTN received consideration for all home market sales it claims are samples, none of its home market sample sales meet either criteria for exclusion established by NSK[,115 F.3d 965]. . . .

Therefore, because NTN's alleged [United States] and home market sample sales do not qualify for exclusion under NSK[,115 F.3d 965], [Commerce] ha[s] included these sales in [Commerce's United States] and home market databases for these final results.

Final Results, 63 Fed. Reg. at 63,872-73 (citations omitted).

B.    Contentions of the Parties

NTN contends that Commerce acted contrary to NSK, 115 F.3d 965, when it included NTN's zero-priced sample sales in NTN's United States sales database. See NTN's Mem. at 6, 33; NTN's Reply at 12.    NTN argues that Commerce's "refusal to accept NTN's submitted sample sales documentation and explanation of these sales because NTN cannot prove that consideration was not present is unreasonable and an abuse of discretion."  NTN's Mem. at 32; see id. (citing NTN's App. Mem. Attachs. 2 and 6 (proprietary version)).  Moreover, NTN asserts that: (1) "NTN provided complete sales data for all [United States] transactions in its [United States] database, including zero-priced-sample transactions[;] . . . [2] NTN provided a complete narrative for Section C of [Commerce's] questionnaire which detailed its selling practices in the United States[;] . . . [and] [3] NTN fully addressed all [of Commerce's] requests for information regarding its [United States] transactions."  NTN's Reply at 13 (citing NTN's Reply Attach. 2) (proprietary version).

Commerce responds that "Commerce properly included in NTN's [United States] and home market sales databases sample sales for which NTN alleged that it received no consideration."  Def.'s Mem. at 65.  Specifically, Commerce maintains that: (1) with regards to Commerce's inclusion of NTN's zero-priced sample sales in NTN's

United States sales database, "Commerce was unable to find any information that would have aided it in determining whether NTN received anything of value from its [United States] customers[,]" and (2) with regards to Commerce's inclusion of NTN's sample sales in NTN's home market sales database, "the evidence on the record indicated that NTN received consideration for all home market sales it claims were samples."  Def.'s Mem. at 65 (citing Final Results, 63 Fed. Reg. at 63,872-73); see also Def.'s Mem. at 65-69.  Timken supports Commerce's position and asserts that

> NTN[] [had] the burden to come forward with information showing that it made zero-priced sample sales without receiving any consideration.  NTN, however, provided no relevant information and thus NTN failed to carry its burden.  In its brief, NTN cites to its questionnaire response and supplemental response in claiming that it described and documented zero-price sales, but those references are not relevant as they concern home market sales, not [United States] sales.

Timken's Resp. at 36 (citing NTN's Mem. at 32, citing in turn NTN's App. Mem. Attachs. 2 and 6 (proprietary version)); see also Timken's Resp. at 35-37.

### C.   Analysis

Commerce is correct in its reading of the language of NSK, 115 F.3d at 975, as stating that Commerce is not obligated to exclude any transaction from the United States sales database merely because such transaction is labeled as a sample sale.  See Def.'s Mem. at 66, 67.  Similarly, Commerce is correct in its conclusion

that nothing in the statutory mandate or in the holding of <u>NSK</u>, 115 F.3d at 975, "preclude[s] Commerce from requiring a party to demonstrate that it received no consideration in return for the samples." <u>Id.</u> at 67.

During the review at issue, Commerce included NTN's sample sales in NTN's home market sales database because it determined that "the evidence on the record indicated that NTN received consideration for all home market sales [NTN] claims were samples." Def.'s Mem. at 65; <u>see also</u> <u>Final Results</u>, 63 Fed. Reg. at 63,873. Moreover, in the <u>Final Results</u>, Commerce explained that it included NTN's zero-priced sample sales in NTN's United States sales database by stating that

> [Commerce] examined the record to determine whether NTN's [United States] samples lacked consideration and were unable to find any information whatsoever in either NTN's narrative or sales database regarding sample transactions. . . . Because NTN did not provide any information in its response or elsewhere that would have aided [Commerce] in determining whether NTN received anything of value from its [United States] customers for the transactions in question, [Commerce] cannot conclude that NTN received no consideration for these alleged samples. While NTN's database does include sales which are zero-priced, [Commerce] [is] unable to determine from the record if these transactions represent the sales which NTN apparently argues should be excluded from the [United States] database . . . . [I]n this review NTN has not provided any detailed information on the record demonstrating that its alleged zero-priced transactions were in fact samples and lacked an exchange of consideration.

<u>Final Results</u>, 63 Fed. Reg. at 63,872-73 (citations omitted); <u>see</u>

<u>also</u> Def.'s Mem. at 65, 67-69.  Commerce included NTN's claimed sample sales in NTN's United States sales database because Commerce expected NTN, the party in possession of the pertinent information, to carry the burden of producing that information, particularly when NTN was seeking a favorable adjustment or exclusion. <u>See</u> <u>Final Results</u>, 63 Fed. Reg. at 63,872; Def.'s Mem. at 68-69.

The Court finds that Commerce's decision to include the samples designated by NTN as sample ones in NTN's United States and home market sales databases is reasonable.  Commerce is correct in its observation that "[i]t is well settled that the party in possession of information has the burden of producing that information in order to obtain a favorable adjustment or exclusion."  Def.'s Mem. at 69 (relying on <u>NTN Bearing</u>, 23 CIT 486, 83 F. Supp. 2d 1281, and <u>Zenith Elecs. Corp. v. United States</u>, 988 F.2d 1573, 1583 (Fed. Cir. 1993)).  In the case at bar, NTN was the party either in possession of the information regarding the purchase history of its alleged samples, including the price and quantity for any prior or subsequent purchases of these products by the same or other customers, or the party obligated to create and preserve such information in order to obtain a more favorable margin.  NTN's failure to either trace or supply such information to Commerce does not impose an obligation on Commerce to interpret the gaps of information in NTN's favor.  Indeed, the statutory

mandate and the language of NSK, 115 F.3d at 975, apply only to those situations when a respondent can show that the transaction at issue was a sample sale for no consideration. Neither the statute nor NSK, 115 F.3d at 975, encompasses the infinite variety of situations where Commerce could hypothesize that the transactions under review could have been sample sales for no consideration.

Therefore, since the record does not contain necessary information, Commerce could reasonably conclude that the information missing would indicate that the transactions at issue were not sample sales for no consideration within the meaning of 19 U.S.C. § 1677a(a) and (b) and NSK, 115 F.3d 965. See NSK Ltd., 26 CIT at ___, 217 F. Supp. 2d. at 1311-12. For these reasons, the Court affirms Commerce's decision to include NTN's alleged samples in Commerce's final dumping margin calculation.

## X. Commerce's Inclusion of Certain NTN Sales Allegedly Outside the Ordinary Course of Trade

### A. Background

The pertinent section of the United States Code states that NV be based on "the price at which the foreign like product is first sold . . . in the ordinary course of trade . . . ." 19 U.S.C. § 1677b(a)(1)(B)(i). Section 1677b(e)(2)(A) of Title 19 provides that CV be calculated in part, by using "amounts incurred and realized by the . . . producer [under] . . . review . . . in

connection with the production and sale of a foreign like product,
in the ordinary course of trade, for consumption in the foreign
country . . . ." 19 U.S.C. § 1677b(e)(2)(A) (1994). The term
"ordinary course of trade" is defined as

> conditions and practices which, for a reasonable time
> prior to the exportation of the subject merchandise, have
> been normal in the trade under consideration with respect
> to merchandise of the same class or kind. [Commerce]
> shall consider the following sales and transactions,
> among others, to be outside the ordinary course of trade:
>    (A) Sales disregarded under [19 U.S.C. §]
>    1677b(b)(1)[;]
>    (B) Transactions disregarded under [19 U.S.C. §]
>    1677b(f)(2).

19 U.S.C. § 1677(15) (1994) (emphasis supplied).

Section 1677b(b)(1), in turn, addresses the issue of below-
cost sales. Section 1677b(f)(2) deals with the issue of affiliated
parties. While both 19 U.S.C. § 1677b(b)(1) and 19 U.S.C. §
1677b(f)(2) are irrelevant to the part of the determination being
reviewed since neither below-cost sales nor transactions between
affiliated parties were involved, there is a question as to what
other transactions Commerce could consider to fall outside the
"ordinary course of trade." Examining the statutory language,
Commerce concluded that the term "among others" indicated that
sales or transactions other than those involving below-cost sales
or transactions between affiliated parties could be considered
outside the "ordinary course of trade." See Def.'s Mem. at 70.

Moreover, Commerce concluded that the usage of the term "among others" without particular definition of such "other" transactions indicated that Congress intended to grant Commerce broad discretion on the issue and enabled Commerce to devise an appropriate methodology for determining when sales are to be considered as outside the ordinary course of trade. <u>See id.</u> at 71. Commerce's interpretation of the statutory mandate relied on an explanation contained in the SAA which provides that aside from 19 U.S.C. §§ 1677b(b)(1) and f(2):

> Commerce <u>may</u> consider other types of sales or transactions to be outside the ordinary course of trade <u>when such sales or transactions have characteristics that are not ordinary</u> as compared to sales or transactions generally made in the same market. Examples of such sales or transactions include <u>merchandise produced according to unusual product specifications [or] merchandise sold at aberrational prices</u> . . . . [Section 1677(15)] does not establish an exhaustive list, but [the statutory scheme] intends that Commerce will interpret [19 U.S.C. § 1677(15)] in a manner which will avoid basing normal value on sales which are extraordinary for the market in question, particularly when the use of such sales would lead to irrational or unrepresentative results.

H.R. Doc. 103-316 at 834 (emphasis supplied).

Therefore, in the case at bar, "Commerce exercised its discretion and determined that NTN's highly profitable sales and sample sales for which NTN received consideration were not demonstrated to be outside the ordinary course of trade." Def.'s Mem. at 71-72.

B.    Contentions of the Parties

NTN contends that Commerce erred when it failed to exclude NTN's home market sales with unusually high profit levels and home market sample sales from Commerce's margin calculations and CV profit calculation, despite what NTN considers to be sufficient evidence on record indicating that these transactions were outside the ordinary course of trade.  See NTN's Mem. at 6-7, 34-37; NTN's Reply at 14-17.  In particular, NTN asserts that the evidence on the record includes: (1) an NTN submitted exhibit which provides a profit chart and identifies sample sales with unusual profits that NTN considers outside of the ordinary course of trade, see NTN's Mem. at 34 (citing NTN's App. Mem. Attach. 6 (proprietary version)); NTN's Reply at 15 (citing NTN's Reply Attach. 3 (proprietary version)); (2) NTN's questionnaire response explaining that "samples sales are only provided for one reason--to help a customer determine whether a particular bearing suits a particular application[,]" NTN's Reply at 16 (citing NTN's Reply Attach. 5 (proprietary version)); (3) NTN's "sample sales [that] are specifically recorded in NTN system's when they are made using [a certain] prefix," NTN's Reply at 16; and (4) an exhibit provided to Commerce by NTN depicting "a price comparison by part number of non-zero-priced sample sales and sales in the ordinary course of trade." NTN's Mem. at 35.

Commerce asserts that Commerce's determination was a reasonable application of the statutory mandate and supported by substantial evidence. See Def.'s Mem. at 69-79. Commerce argues that the evidence provided by NTN fails to demonstrate that such sales were, in fact, outside the ordinary course of trade. See id. at 74-79. In particular, Commerce contends that: (1) "the presence of profits higher than those of other sales does not necessarily place the sales outside the ordinary course of trade[,]" id. at 76; and (2) "the mere fact that particular sales are labeled as sample sales and are made in small quantities does not require Commerce to treat them as sales made outside the ordinary course of trade . . . ." Id. at 77; see also id. at 78-79.

Timken supports Commerce's position and states that NTN "bears the burden of proving that . . . sales are not in the ordinary course of trade . . . [and that] NTN [has] failed to show that home market sample sales and high-profit sales were outside the ordinary course of trade." Timken's Resp. at 38; see also id. at 38-42.

## C.   Analysis

In determining whether a sale is outside the ordinary course of trade, Commerce must consider not just "one factor taken in isolation but rather . . . all the circumstances particular to the sales in question." Murata Mfg. Co. v. United States, 17 CIT 259,

264, 820 F. Supp. 603, 607 (1993). Commerce's methodology for making this determination is codified in section 351.102(b) of Commerce's regulations. See 19 C.F.R. § 351.102(b) (1998); see also Torrington Co. v. United States, 25 CIT ___, ___, 146 F. Supp. 2d 845, 860-63 (2001) (detailing Commerce's methodology for deciding when sales are outside the "ordinary course of trade" and finding both Commerce's interpretation of 19 U.S.C. § 1677(15) and Commerce's methodology reasonable). Moreover, the court in Koenig & Bauer-Albert AG v. United States, 22 CIT 574, 589, 15 F. Supp. 2d 834, 850 (1998), vacated on other grounds, 259 F.3d 1341 (Fed. Cir. 2001), articulated that "Commerce has the discretion to decide under what circumstances highly profitable sales would be considered to be outside the ordinary course of trade," but also recognized that Commerce cannot "impose this requirement arbitrarily." Koenig, 22 CIT at 589 n.8, 15 F. Supp. 2d at 850 n.8. Additionally, the plaintiff has the burden of proving whether the sales used in Commerce's calculations are outside the ordinary course of trade. See, e.g., Nachi-Fujikoshi Corp. v. United States, 16 CIT 606, 608, 798 F. Supp. 716, 718 (1992) (citations omitted).

### 1. Commerce's Inclusion of Certain NTN Sales Allegedly Outside the Ordinary Course of Trade in Commerce's Margin Calculations

The first issue is whether Commerce reasonably included sample sales and sales with high profit levels in the margin calculation of NTN's home market sales, instead of determining that such sales were outside the ordinary course of trade, and accordingly excluding them. During the POR, in its questionnaire to NTN, Commerce stated:

> If [NTN] consider[s] a sale to be outside the ordinary course of trade, report "YES" in this field. If the sale was in the ordinary course of trade, report a "NO." If [NTN] claim[s] that any of [its] home market sales are outside the ordinary course of trade [NTN] must provide a detailed explanation why. Please note that the burden of proof is on [NTN] to demonstrate, through narrative explanation of the circumstances surrounding such sales and supporting documentation or other evidence, that sales claimed to be outside the ordinary course of trade are in fact outside the ordinary course of trade. [Commerce] will not consider only one factor in isolation (i.e., the fact that certain sales are labeled as samples, or that a transaction involved small quantities or high prices) as sufficient proof that a sale is not in the ordinary course of trade.

Def.'s Mem. at 75 (emphasis supplied) (quoting NTN's App. Mem. Attach. 6 (proprietary version)). In response, NTN in support of its claim that samples and sales with high profit levels were not in the ordinary course of trade, asserted that: (1) any sale with a profit level greater than a certain percentage would be automatically deemed being outside the ordinary course of trade because that percentage was the greatest profit level in the range

of profits at which most of the quantity of subject merchandise was sold; or (2) all sales with a profit level exceeding a certain percentage be treated as sales not in the ordinary course of trade because the majority of pieces sold above cost did not exceed this profit level. See NTN's App. Mem. Attach. 6 (proprietary version). Moreover, NTN asserted that it provided Commerce with sufficient record evidence and points to a number of exhibits in its memorandum referring to zero-priced and non-zero priced sample data. See NTN's Mem. at 34-35; NTN's Reply at 16 (citing NTN's Reply Attach. 5 (proprietary version)). NTN also cites CEMEX, S.A. v. United States, 133 F.3d 897 (Fed. Cir. 1998), in support of its argument that Commerce should exclude sales with abnormally high profit levels. See NTN's Mem. at 36; NTN's Reply at 14-15.

In the Final Results, 63 Fed. Reg. at 63,873-74, Commerce laid out its practice concerning the exclusion of sample sales from the margin calculation when such sales, in fact, fall outside the ordinary course of trade. Commerce stated that it

> examined the record with respect to NTN's alleged home market sample sales to determine if these sales qualify for such an exclusion. In its original questionnaire response, NTN only states that "samples are provided to customers for the purpose of allowing the customer to determine whether a particular product is suited to the customer's needs" and that "the purpose . . . would not be the same as those purchased in the normal course of trade." . . . Furthermore, NTN did not provide additional information in its supplemental response clearly demonstrating that its alleged sample sales were outside the ordinary course of trade. . . . However,

the mere fact that a respondent identified sales as
samples does not necessarily render such sales outside
the ordinary course of trade. . . . For these reasons,
[Commerce] disagree[s] with NTN that its home market
sample sales should be excluded from [the] margin
calculations.

Final Results, 63 Fed. Reg. at 63,873 (citations omitted) (emphasis
supplied).

Commerce also stated that NTN failed to provide any further
evidence illustrating that any of NTN's "high profit" sales were
actually outside the ordinary course of trade.  See id. at 63,873-
74.  According to Commerce, "[t]he mere existence of high profits
by itself is not evidence that these same profits were abnormally
high, and is not sufficient to find sales to be outside the
ordinary course of trade."  Id. at 63,874.

The Court finds that Commerce properly included NTN's sample
sales and sales with high profit in the margin calculation of NTN's
home market sales.  Although the CAFC in CEMEX, 133 F.3d at 901,
sustained Commerce's determination that certain home market sales
were outside the ordinary course of trade, the court noted that for
that review, Commerce had examined factors additional to profit.
In the case at bar, however, NTN supports its contentions with
evidence regarding only one factor, namely profit.  See Final
Results, 63 Fed. Reg. at 63,874; CEMEX, 133 F.3d at 900 (stating
that Commerce must evaluate not just "one factor taken in isolation

but rather . . . all the circumstances particular to the sales in question"). Furthermore, this Court has held that a lack of showing that the transactions at issue possessed some unique and unusual characteristic that make them unrepresentative of the home market allot Commerce the discretion to include such transactions in NTN's home market database. See NSK Ltd., 26 CIT at ___, 217 F. Supp. 2d at 1315 (citing NTN, 19 CIT at 1229, 905 F. Supp. at 1091).

Accordingly, the Court sustains Commerce's decision to include NTN's sample sales and sales with high profit in the margin calculation of NTN's home market sales.

### 2.    Commerce's Inclusion of Certain NTN Sales Allegedly Outside the Ordinary Course of Trade in Commerce's CV Profit Calculations

NTN raises the related argument that since NTN's sample sales and sales with abnormally high profits are outside the ordinary course of trade, they should also be excluded from Commerce's CV calculation. See NTN's Mem. at 36-37. In response, Commerce stated that "Commerce rejected [NTN's] argument because the mere fact that NTN identified sales as samples did not necessarily render such sales outside the ordinary course of trade and the mere existence of high profits by itself was not evidence that these profits were abnormally high and was not sufficient to find sales

to be outside the ordinary course of trade." Def.'s Mem. at 78-79
(citing Final Results, 63 Fed. Reg. at 63,873-74); see also
Timken's Resp. at 42.

The Court finds that Commerce properly included NTN's sample
sales and sales with high profit in the calculation of CV profit.
See supra Discussion Part X, C1 (Analysis); see also Koenig, 22 CIT
at 589, 15 F. Supp. 2d at 850.

XI. **Commerce's Reliance Upon the Sum-of-Deviations Methodology for its Model Match Analysis**

A. **Background**

During this review, Commerce relied upon the "sum-of-
deviations" ("SUMDEV") methodology to determine NTN's similar home
market models of the merchandise under review as potential matches
to the United States models. See Final Results, 63 Fed. Reg. at
63,874. In the Final Results, Commerce explained:

> Pursuant to [19 U.S.C. § 1677(16) (1994)],[17]

---

[17] Section 1677(16) of Title 19 of the United States Code
defines the term "foreign like product" as:

merchandise in the first of the following categories in
respect of which a determination . . . can be
satisfactorily made:
  (A) The subject merchandise and other merchandise which
is identical in physical characteristics with, and was
produced in the same country by the same person as, that
merchandise.
  (B) Merchandise-

(continued...)

[Commerce] must first search for home market merchandise which is identical in physical characteristics to that sold in the United States. When products sold to the United States do not have identical matches in the foreign market, the statute directs [Commerce] to use similar merchandise which meets the requirements set forth under [19 U.S.C. § 1677(16)(B)].

For purposes of the current and previous TRBs administrative reviews, when determining appropriate product comparisons for [United States] sales [Commerce] first attempt[s] to match [United States] TRB models to identical models sold in the home market. If an identical model is unavailable, [Commerce] appl[ies] [its] "sum-of-the-deviations" methodology to determine those models most similar to the [United States] models, using five physical criteria of TRBs: inside diameter, outside diameter, width, load rating, and Y2 factor. Because each of these criteria is quantitatively measured, [Commerce] derive[s] the overall sum-of-the-deviations for all five characteristics and use[s] this absolute value to rank models. . . . In order to satisfy the statutory requirement set forth in [19 U.S.C. § 1677(16)(B)(iii)] . . . that similar merchandise be "approximately equal in commercial value", prior to assigning sum-of-the-deviations values for ranking purposes [Commerce] eliminates as possible matches those models for which the variable cost of manufacturing

---

[17](...continued)
    (i)  produced in the same country and by the same person as the subject merchandise,
    (ii) like that merchandise in component material or materials and in the purposes for which used, and
    (iii) approximately equal in commercial value to that merchandise.
  (C) Merchandise-
    (i)  produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
    (ii) like that merchandise in the purposes for which used, and
    (iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16) (1994).

(VCOM) differences exceed 20 percent of the total costs
of manufacturing (TCOM) of the [United States] model.

Final Results, 63 Fed. Reg. at 63,874 (citations omitted); see also

Koyo Seiko Co. v. United States, 66 F.3d 1204, 1209 (Fed. Cir.

1995) (holding  that "Congress has implicitly delegated authority

to Commerce to determine and apply a model-match methodology

necessary to yield 'such or similar' merchandise under [19 U.S.C.

§ 1677(16)].  This Congressional delegation of authority empowers

Commerce to choose the manner in which 'such or similar'

merchandise shall be selected.  Chevron applies. . . .").


### B. Contentions of the Parties

NTN argues that Commerce's practice of exclusively "ranking"

similar merchandise on the basis of the SUMDEV methodology does not

allow Commerce to yield the most similar matches because the test

fails to account for the cost deviation among the TRB models.

See NTN's Mem. at 7, 37-38; NTN's Reply at 18.  Specifically, NTN

contends that "[t]he exclusive use of the [SUMDEV] methodology to

rank similar models creates the possibility that [United States]

sales will be matched to sales with a relatively low [SUMDEV]

total, but a very high difmer total, while another sale may have a

very similar, but higher, [SUMDEV] total, but a much lower difmer

total."  NTN's Mem. at 38.  NTN uses a hypothetical example to

attempt to show that Commerce's SUMDEV methodology is prima facie

distortive.  <u>See id.</u>  In addition, NTN cites to <u>Bowe-Passat v.</u> <u>United States</u>, 17 CIT 335, 340 (1993), as support for its contention that Commerce should be ordered to modify the SUMDEV methodology "to account for cost deviation among models [in order for Commerce] to fulfill [its] statutory mandate . . . ."  NTN's Mem. at 38; <u>see also</u> <u>id.</u> at 39.

Commerce responds that "Commerce properly based its model match analysis upon the [SUMDEV] methodology."  Def.'s Mem. at 79. Commerce asserts that 19 U.S.C. § 1677(16) "'does not require [Commerce] to follow NTN's suggested methodology'" and provides general guidance in selecting the products sold in the foreign market to be compared to United States merchandise.  <u>See</u> <u>id.</u> (quoting <u>Final Results</u>, 63 Fed. Reg. at 63,874); <u>see also</u> Def.'s Mem. at 79-80 (citing <u>Final Results</u>, 63 Fed. Reg. at 63,874).  The statute first directs Commerce to find home market merchandise which is, preferably, physically identical with merchandise sold in the United States and, if unavailable, to search for merchandise that would satisfy 19 U.S.C. § 1677(16)(B). <u>See</u> Def.'s Mem. at 80-82.  To satisfy such statutory requirements, Commerce, "[w]hen identical merchandise was not available, . . . used its [SUMDEV] methodology, coupled with the 20 percent difmer test, to identify the most similar home market TRBs for comparison with the [United States] TRBs."  <u>Id.</u> at 82.

Additionally, Commerce maintains that "NTN has not demonstrated that Commerce's use of its established methodology was, in fact, distortive." Id. at 82; see also Final Results, 63 Fed. Reg. at 63,875. Therefore, Commerce contends that Commerce's SUMDEV methodology is: (1) a reasonable application of its discretion to determine what constitutes similar merchandise for the purpose of calculating NV; (2) supported by substantial record evidence; and (3) in accordance with law. See Def.'s Mem. at 79-81.

Timken agrees with Commerce and states that "Commerce's model match analysis is reasonable, . . . in accordance with law, and has been upheld by the [CAFC]" in Koyo, 66 F.3d 1204. Timken's Resp. at 43; see also id. at 43-46.

### C. Analysis

In Koyo, 66 F.3d at 1209, the CAFC held that "Congress has implicitly delegated authority to Commerce to determine and apply a model-match methodology necessary to yield 'such or similar' merchandise under [19 U.S.C. § 1677(16)]. This Congressional delegation of authority empowers Commerce to choose the manner in which 'such or similar' merchandise shall be selected. Chevron applies in such a situation." (Citations omitted).

In the case at bar, Commerce explained:

> [19 U.S.C. § 1677(16)] does not require [Commerce]
> to follow NTN's suggested methodology. . . .
>
> [19 U.S.C. § 1677(16)] directs [Commerce] to select
> home market comparison merchandise which is, preferably,
> physically identical to merchandise sold in the United
> States.   If identical comparison merchandise is
> unavailable, [Commerce] may then select merchandise which
> is physically similar, after adjusting for any
> differences in the physical characteristics of the
> comparison merchandise (the so-called difmer adjustment).
> The statute is silent, however, as to the precise manner
> in which similar merchandise is to be identified. . . .
> [Commerce's] TRBs product-comparison methodology conforms
> with the express language of [19 U.S.C. § 1677(16)] . .
> . ; if the preferred (i.e., identical) match is
> unavailable, our margin program then searches for
> commercially comparable merchandise which is physically
> the most similar to the [United States] merchandise as
> determined using the . . . five physical criteria of
> TRBs.  While NTN suggests that cost deviation values be
> added as a matching criteria, [Commerce] note[s] that the
> selection of similar merchandise is based on a product's
> physical characteristics and not differences in costs.
> Furthermore, [Commerce's] matching methodology satisfies
> NTN's apparent concerns that dissimilar merchandise may
> be compared because it precludes the pairing of models
> whose cost deviation exceeds 20 percent and provides for
> a difmer adjustment to NV if non-identical TRB models are
> matched.

Final Results, 63 Fed. Reg. at 63,874-75.

The Court agrees that Commerce is not required to adopt the
particular matching methodology advanced by NTN, see Koyo, 66 F. 3d
1209; NTN Bearing Corp. of Am. v. United States, 18 CIT 555, 559
(1994); Timken Co. v. United States, 10 CIT 86, 98, 630 F. Supp.
1327, 1338 (1986), and finds that Commerce's decision to apply its
SUMDEV methodology is reasonable and in accordance with law.  See

Peer Bearing Co. v. United States, 25 CIT ___, ___, 182 F. Supp. 2d
1285, 1305 (2001) (pointing out that "'[i]n the absence of a
statutory mandate to the contrary, Commerce's actions must be
upheld as long as they are reasonable'" (quoting Timken Co. v.
United States, 23 CIT 509, 516, 59 F. Supp. 2d 1371, 1377 (1999));
see also Chevron, 467 U.S. at 844-45.

The Court also agrees with Commerce that NTN has failed to
demonstrate that Commerce's use of its SUMDEV methodology is, in
any way, distortive.  NTN merely supplies the Court with a
hypothetical example suggesting that Commerce's "exclusive use of
the [SUMDEV] methodology to rank similar models creates the
possibility that [United States] sales will be matched to sales
with a relatively low [SUMDEV] total, but a very high difmer total,
while another sale may have a very similar, but higher, [SUMDEV]
total, but a much lower difmer total."  NTN's Mem. at 38.  Such a
suggestion is not sufficient evidence to prove that Commerce's
methodology is in any way distortive or an unreasonable
interpretation of Commerce's discretion to "determine and apply a
model-match methodology necessary to yield 'such or similar'
merchandise under [19 U.S.C. § 1677(16)]."  Koyo, 66 F.3d at 1209.

## XII. Commerce's Level of Trade Sales Match Program

### A.  Background

During the POR, Commerce explained its matching program

stating that

> [Commerce's] sales match programming contains a series of instructions which [are] designed to first search for a match at the same LOT before looking for a match at a different level.  For each of the ten passes in [Commerce's] multi-level array sales match, with each "pass" representing the next-most-similar merchandise, the variable "CAT" is set to the LOT of the [United States] sale to be matched.  [Commerce's] program uses this index variable to search for corresponding same-LOT NVs (which have been organized according to LOT) within the contemporaneity window.  If, after searching each of the six window months, a same-LOT match is not found, the program will begin searching for a match at a different LOT by setting the "CAT" variable to a different LOT than that of the [United States] sale, and only then begin searching at that different LOT in each of the window months.

> While the "IF" statement at lines 1388-1389 of the computer program to which NTN refers appears to elevate time period over LOT in [Commerce's] matching hierarchy, the program is instead assigning a "flag" variable depending on which interation of the loop is in progress (i.e., the first loop searches for same-level matches, the second searches for matches at the next closest LOT, and so on).  As Timken notes, [Commerce's] program correctly operates by exhausting all possible same-LOT matches within the contemporaneity window before searching for a different LOT match; therefore, [Commerce] ha[s] made no changes for these final results.

Final Results, 63 Fed. Reg. at 63,875.

## B.   Contentions of the Parties

NTN contends that Commerce's matching program is contrary to 19 U.S.C. § 1677b(a)(1)(B)(i) because Commerce's "sales matching program erroneously failed to give priority to LOT over time when matching sales."  NTN's Mem. at 39.  In particular, NTN maintains that Commerce's "program is set to match sales in the same month and at the same LOT . . . [and] [w]here there are no sales at the same LOT for that period, the program is directed to look for sales at different LOTs during the same month."[18]  NTN's Reply at 20 (citing NTN's Reply Attach. 6 (proprietary version)).  NTN argues that Commerce's matching methodology results in distorted margins. See NTN's Mem. at 39-40. NTN, therefore, proposes a modified methodology "[i]n order to account for the consistent price difference between levels of trade."[19]  Id. at 40.

---

[18]    NTN in its reply brief points to certain language in Commerce's computer program and maintains that "[t]he effect of this programing language, we believe, is that sales are compared to merchandise at different levels of trade, rather than being compared to contemporaneous month sales as defined by 19 C.F.R. § 351.414(e)(2) [1998], and at the same level of trade."  NTN's Reply at 20 (citing NTN's Reply Attach. 6 (proprietary version)).

[19]    Although NTN proposes a modified methodology, the Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).  Moreover, the Court is not persuaded by NTN's argument that Commerce's matching methodology results in distorted margins because NTN fails to point to record evidence to support its view.

Commerce argues that its LOT matching program is consistent with 19 U.S.C. § 1677b(a)(1)(B)(i) because "it . . . operates properly by exhausting all possible contemporaneous month LOT matches before searching for a match at a different LOT." Def.'s Mem. at 84; see also id. at 84-85.

Timken generally agrees with Commerce that Commerce's LOT matching program "looks for a match at the same level of trade at any time within the window of time for matching before it looks for a match at a different level of trade." Timken's Resp. at 47. Timken argues that NTN's contention that Commerce's LOT matching program failed to give priority to LOT over time is misplaced and that "the error that NTN complains of does not exist." Id.

## C. Analysis

The applicable statute provides that NV is "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country . . . to the extent practicable, at the same level of trade." 19 U.S.C. § 1677b(a)(1)(B)(i). Moreover, the relevant regulation provides:

Normally, [Commerce] will select as the contemporaneous month the first of the following which applies:

(i) The month during which the particular [United States] sale under consideration was made;
(ii) If there are no sales of the foreign like product

during this month, the most recent of the three months
prior to the month of the [United States] sale in which
there was a sale of the foreign like product[;]
     (iii) If there are no sales of the foreign like
product during any of these months, the earlier of the
two months following the month of the [United States]
sale in which there was a sale of the foreign like
product.

19 C.F.R. § 351.414(e)(2) (1998).


     In the case at bar, Commerce explained:

     Commerce's program runs the same LOT through the
contemporaneous month loops before changing the LOT. The
program first assigns the variable "CAT" equal to a LOT.
. . . The program then runs that LOT ("CAT") through the
contemporaneous month, searching for a match. . . . In
this part of the program, "CAT" stays constant while the
contemporaneous month periods are searched. Only after
the same "CAT" has searched through the contemporaneous
month, does the program allow the CAT variable to change.
. . . With the newly assigned CAT variable, e.g., a
different LOT, the program again is ready to go through
the contemporaneous month loop at the new LOT.

Def.'s Mem. at 84-85 (citations omitted); see also Final Results,

63 Fed. Reg. at 63,875. In addition, in the Final Results,

Commerce stated that "[w]hile the 'IF' statement at lines 1388-1389

of the computer program to which NTN refers appears to elevate time

period over LOT in [Commerce's] matching hierarchy, the program is

instead assigning a "flag" variable depending on which iteration of

the loop is in progress." 63 Fed. Reg. at 63,875 (emphasis

supplied).


     Based on the foregoing, the Court finds that Commerce's LOT

matching program is in accordance with law (that is, 19 U.S.C. §

1677b(a)(1)(B)(i) and 19 C.F.R. 351.414(e)(2)).  See <u>Peer Bearing</u>, 25 CIT at ___, 182 F. Supp. 2d at 1305 (pointing out that "'[i]n the absence of a statutory mandate to the contrary, Commerce's actions must be upheld as long as they are reasonable'" (quoting <u>Timken Co.</u>, 23 CIT at 516, 59 F. Supp. 2d at 1377)); <u>see also</u> <u>Chevron</u>, 467 U.S. at 844-45, <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139-40 (1944).

**XIII.     Commerce's Error in Using an Incorrect LOT Adjustment Factor for Certain EP Sales**

NTN argues that Commerce "utilized the wrong adjustment factor in its computer program when making the level of trade adjustment for certain EP sales."  NTN's Mem. at 41 (citing NTN's App. Mem. Attach. 5 "Clerical Error Letter" (proprietary version)).

Commerce "concur[s] with NTN that Commerce committed clerical error and used an incorrect LOT adjustment for certain EP transactions . . . [and] that the LOT adjustment factors proposed by NTN are correct."  Def.'s Mem. at 85 (citing NTN's App. Mem. Attach. 5 "Clerical Error Letter" (proprietary version)).

In light of the foregoing, the Court remands this issue to Commerce to correct the clerical error in accordance with NTN's App. Mem. Attach. 5 "Clerical Error Letter" (proprietary version) and to recalculate NTN's margin rates.

### CONCLUSION

This case is remanded to Commerce to correct the clerical error resulting from Commerce's use of an incorrect LOT adjustment factor for NTN's EP sales and to recalculate NTN's margin rates accordingly.  All other issues are affirmed.


_____
NICHOLAS TSOUCALAS
SENIOR JUDGE


Dated:     January 24, 2003
           New York, New York